2001 OK CR 13

**Steven Lynn ABSHIER, Appellant,**

**v.**

**STATE of Oklahoma, Appellee.**

**No. F–98–188.**

Court of Criminal Appeals of Oklahoma.

May 24, 2001.

Rehearing Denied July 12, 2001.

Robert H. Macy, District Attorney, Susan L. Caswell, Lynn Loftis, Assistant District Attorneys, Oklahoma City, OK, Attorneys for the State at trial.

Paul Faulk, Indigent Defense System, Norman, OK, Attorney for Defendant at trial.

Anita Sanders, Oklahoma City, OK, Attorney for Defendant at trial.

James H. Lockard, Perry W. Hudson Norman, OK, Attorneys for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## OPINION

LILE, JUDGE:

¶1 Steven Lynn Abshier was tried by jury in January 1998[1] for the crime of First Degree Murder of a Child in violation of 21 O.S.1991, § 701.7(C) in the District Court of Oklahoma County, Case No. CF–95–2194, before the Honorable Roma McElwee, District Judge. The jury returned a verdict of guilty and found the existence of two aggravating circumstances beyond a reasonable doubt: (1) "The murder was especially heinous, atrocious, or cruel," and (2) "The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The jury set his punishment at death. On February 5, 1998, the trial court sentenced Abshier to death in accordance with the jury's verdict. From this Judgment and Sentence Abshier has perfected his appeal to this Court.

## FACTS

¶2 The victim in this case, Ashley Nicole Abshier, was born May 25, 1993. At the time she was murdered on March 30, 1995, she was twenty-two (22) months old and weighed twenty-two (22) pounds. She was the natural daughter of Stephanie Abshier[2] and the Appellant, Steven Lynn Abshier. Stephanie married Appellant around June of 1993. By the fall of 1994, the three were living in Eufaula, Oklahoma. Stephanie was working at McDonalds, and Appellant normally stayed home with Ashley. Stephanie did not drive and was completely dependent upon Appellant to drive her to and from work, and to take care of Ashley while she was at work.

¶3 Sherrie Casey, the mother of a friend of Appellant testified that she saw the Abshiers every two or three days in Eufaula and felt like a grandmother to Ashley. Once, in the fall of 1994, she saw Appellant, in Casey's front yard, grab Ashley by the arm and then kick her hard enough to knock her down. In response to that incident Casey placed an anonymous telephone call to the Department of Human Services to report the abuse she had seen Appellant inflict on Ashley.

¶4 Another time it appeared Appellant may have hit or pushed Ashley while he was arguing with his wife, knocking Ashley out of the car into the street in front of Casey's house where she skinned her face. Casey wasn't certain that he hit her or pushed her that time, but she saw Ashley, who was between Stephanie and Appellant, climb over him and fall out onto the street while the parents were arguing. This would have been the only time she saw Appellant abuse Ashley in the presence of Stephanie, but she was not sure it was abuse that time. Appellant once told Casey he would whip or beat Ashley until she learned how to use the toilet.

¶5 It did not appear to her that the Department of Human Services had responded to her first call, so she made a follow-up call to find out what was being done about the abuse.

---

1. Appellant was sentenced February 5, 1998. His Petition in Error was filed in this Court July 31, 1998. Appellant's Brief was filed March 23, 1999, Appellee's Brief was filed July 21, 1999, and Appellant's Reply Brief was filed August 9, 1999. Oral Argument was held January 25, 2000. An evidentiary hearing on Sixth Amendment claims was held in District Court on August 8, 2000, and the "District Court Findings of Fact and Conclusions of Law" was filed September 7, 2000. The Supplemental Brief of Appellant was filed October 23, 2000.

2. Stephanie Abshier was charged with First Degree Murder in Oklahoma County Case No. CF–95–2194 for permitting child abuse resulting in the death of her daughter. She testified against her husband at his trial in 1998. She had been in jail almost three years at the time and had a plea agreement to plead guilty to an amended charge of Murder in the Second Degree in return for a recommendation from the District Attorney for a twenty-five year sentence.

¶ 6 Another time she had seen Appellant, while in the front seat of the car, grab Ashley by the arm, and throw her from the back seat into the front seat. Later that same day, while baby-sitting Ashley, Casey changed Ashley's diaper. Ashley started crying and Casey observed bruises all over her—on the top part of her legs, face, stomach, bottom, and arms, many of which were apparently not visible until she removed her clothing and diaper. Casey also observed that Ashley seemed to be protecting her left arm. Casey made another anonymous call to the Department of Human Services to report the abuse she had observed that day. This was apparently the call received by Curt Been.

¶ 7 Stephanie Abshier testified that in the fall of 1994 she had noticed bruises and injuries to the child, but had never seen Abshier hurt her. Appellant would tell her different stories as to how Ashley became injured, and she said she believed him at the time. She noticed that the child began to react differently to him. When only Stephanie was around, Ashley would be happy, and "she was all right." But when Appellant was around and he was holding her, she would appear sad and afraid of her dad. She would start crying and would start screaming, "Mommy, mommy."

¶ 8 Near the end of October 1994, an incident occurred in their car in the Wal–Mart parking lot. Stephanie and Ashley had been shopping while Appellant waited for them in the car. He got mad because of something Stephanie had bought for Ashley. Ashley started crying, and he told her, "Just shut up, you stupid, little, fucking, whining brat," and he hit her on her left arm.

¶ 9 Curt Been, a Department of Human Services worker in Eufaula, took the anonymous call about Ashley in October of 1994. He assigned the case Priority I, the highest priority, and although the call came in at 5:00 p.m., he went out to Abshier's house with a police officer that day. Mr. Been met Appellant, Stephanie, and Ashley at the home and observed Ashley. He saw a knot on Ashley's forehead which Appellant said was caused when she was running through the house and tripped and fell. The Abshiers had not taken her to a doctor.

¶ 10 Ashley was able to raise her arms without apparent pain. She was wearing a tee-shirt and terry cloth shorts. Been and the officer did not look for injuries on the parts of her body that were covered by her clothing.

¶ 11 Because he had not seen any more injuries on her, Been and the officer determined there was not enough to take the child then, but Been told the parents to have her examined at the clinic just to make sure she was okay. The parents agreed they would take her to the Indian clinic in Eufaula.

¶ 12 The next day, Been checked with the clinic and found that Appellant had not yet taken Ashley there. Been got another officer from the police department and returned to the Abshiers' house to find out why. After Been knocked for some time, Appellant answered the door. He looked like he had just woke up, but insisted, "I'm going to take her." Been called the clinic when he got back to his office and verified that the Abshiers had arrived at that time. Stephanie testified Appellant was the one who took Ashley to the Indian clinic while she, Stephanie, was at work.

¶ 13 The clinic transferred Ashley to St. Francis Hospital in Tulsa, Oklahoma. Dr. Boone, an orthopedic surgeon, testified that he saw Ashley November 1, 1994, at St. Francis Hospital. She had been brought in the night before. He verified that her upper left arm was broken, a fracture of the upper humerus with minimal displacement, and she had multiple contusions or bruises. According to the history given by the mother at the emergency room, the father stated the child tripped over a tool box. Stephanie also testified at trial that Appellant had told her the same thing.

¶ 14 Dr. Boone said that normally a simple fall would not produce enough energy or velocity in a child of Ashley's age with healthy bones to fracture the humerus. Ashley's bones otherwise appeared healthy. Dr. Boone also testified that tests had been performed at St. Francis Hospital November 1, 1994, that showed that Ashley did not bruise

more easily than normal. He believed that Ashley's injuries were secondary to blunt trauma, and by history, secondary to child abuse. For a person to cause that kind of fracture with a hand or fist would require most of their force. Such a fracture could be caused by someone slinging a child by the arm.

¶ 15 Stephanie wrote out a statement of what had happened, and based upon her agreement to leave Appellant, Ashley was allowed to remain with her. Stephanie went to stay at her father's house with Ashley.

¶ 16 In December of 1994, Appellant got back together with Stephanie. In mid-January 1995 they moved with Ashley to Oklahoma City to avoid being found by the Department of Human Services. The Department issued a pick-up order for the child.

¶ 17 Initially, in Oklahoma City, they stayed at the house of a friend, Ed Banister, before moving into their own house at 1802 South Stonewall. Stephanie got a job at Hardee's restaurant near 74th Street and South Pennsylvania Avenue. Abshier stayed home to take care of Ashley.

¶ 18 On the evening before Ashley died, the Abshiers ate dinner at Ed Banister's house. They returned home by 9:00 or 9:30 p.m., but Appellant left again, returning some time around 4:00 or 4:30 the next morning.

¶ 19 On March 30, 1995, Stephanie awoke at approximately 5:00 a.m. and was supposed to be at work by 6:00 a.m. However, she was not able to awaken Appellant to take her to work, so she went back to sleep. She woke up again at 9:00 a.m. and was able to wake Appellant, and he drove her to work.

¶ 20 The Hardee's manager, Mary Gilbert, testified that Stephanie was scheduled to come in at 6:00 a.m. but didn't clock in until 9:32 a.m. The time was verified by the personnel time tape. Gilbert further testified, "[Stephanie] said that her husband was out all night with the landlord and he was late getting back and couldn't get her to work."

¶ 21 Appellant returned to Hardee's, with Ashley, after lunch time. She did not appear injured at that time to the manager, Mary Gilbert, or to the co-employee, Fred Toliver, or to Stephanie. Appellant asked Stephanie to get him and Ashley something to eat. Stephanie told him to wait, that she thought there was some food in the house, and that she would see about getting some food to take home when she got off work that evening. Stephanie testified he became really angry, and "he just like stormed out of the door," carrying Ashley. Ms. Gilbert also testified that Appellant was upset when he left, and that, "He kind of slammed the door-and rushed out."

¶ 22 Around 2:00 p.m., Nancy Connelly, a neighbor of Appellant saw him walk out of his house alone, carrying something that looked like a blanket and push it into the trunk of his car before slamming the trunk lid down. She described the car as an old noisy, "[w]hite and light blue T Bird, rusted and beat up."

¶ 23 When he looked over at Connelly, he looked surprised or nervous. He started up his car and "revved the motor and took off like he was in a hurry ... and you could hear him squealing the tires down the street." When the police searched his car after his arrest, they did not find a blanket in the trunk. There was no other testimony about Abshier's or Ashley's whereabouts between 1:00 and 5:00 p.m.

¶ 24 Around 5:00 p.m., Appellant was parked in front of the front door at Hardee's. He saw Toliver in the parking lot, and demanded that he go get Stephanie. Toliver was heading to his car to leave. Abshier was sitting in his car and had the baby on his shoulder, wrapped in a blanket.

¶ 25 Stephanie came out and went to the passenger side of the car. Toliver heard her say, "What did you do to my baby?" She got in the car and starting hitting her hands on the dashboard and yelling.

¶ 26 Stephanie testified she saw some blood on Ashley's face, and when she asked Appellant what happened, he told her "that he took her to a park and she—they were—she was playing and that some man pulled up on the curb [in a black LTD] and hit her" with the car. He told her it was a black man, and that he must have been drunk. He

told her that he chased the car but "didn't ever get a tag number or anything like that." When Stephanie asked him why he hadn't taken Ashley to the hospital, he became angry and told her to "shut the flying fuck up." He kept repeating that while she was upset and screaming.

¶ 27 Toliver said they sat there for a second arguing and then they pulled out in front of him and headed north on Pennsylvania Avenue, the same direction that he was traveling home. He saw them pass Hillcrest Hospital, and when he turned off at Youngs Boulevard, they continued north on Pennsylvania.

¶ 28 When they arrived at Southwestern Medical Center, Stephanie ran into the hospital screaming, "My baby's hurt." She told Francis Bradstreet, the triage nurse, that the child was coming in. Abshier brought Ashley in and handed her to Bradstreet.

¶ 29 Bradstreet testified that Ashley's body was cold to the touch, her pupils were dilated, and she was not breathing. "Her face was a mess, just torn away, and she was just purple." Abshier did not have a lot of emotion and was not agitated. He told Bradstreet the child had been run over by a car.

¶ 30 Bradstreet contacted the on-call doctor, Dr. Brent Wauter, who "immediately ran to the room where [Bradstreet] had the child and started assessing the child." Bradstreet observed bruises behind Ashley's ears and what appeared to be a hand mark to the front of her chest. Ashley's body temperature was 88.4 degrees. After the initial assessment, Dr. Wauter pronounced Ashley dead.

¶ 31 Dr. Brent Wauter testified about his examination of the child. At the time Ashley arrived at the hospital, she had liver mortis and rigor mortis. Her body was so stiff that when he lifted her heels, it lifted her entire body all the way to her head without any bend in her buttocks or neck. In Dr. Wauter's opinion, she had been dead "for some time."

¶ 32 Wauter is board certified in Emergency Medicine which requires five years experience and passing a written and oral examination. He testified that Ashley had been beaten, and her injuries could **not** have been the result of an auto-pedestrian accident. If she had been hit by a car, he would have expected to have seen "more massive head injury, crush injuries, [and] tearing of flesh," and "road debris, grease, [and] blood" on her clothing. None of these indications were present. Dr. Wauter concluded the child had been dead for several hours before 5:00 p.m. Her injuries would have required a "blow delivered from an average adult human with no restraint; all their force."

¶ 33 He questioned Abshier and Stephanie. Abshier said that he was the only one with Ashley all day and that they had gone to the park where a car had jumped a curb and hit her. Dr. Wauter testified: "Except for gripping the arms of the chair, he showed no emotion whatsoever, an exceptionally flat affect."

¶ 34 Dr. Wauter spoke with the Abshiers together-and told them Ashley was dead. Stephanie "became extremely angry and hysterical, and screamed [at Abshier], 'You killed her.'" She was taken to a separate room because "[s]he physically was going to attack" her husband. Abshier gave no visible reaction to the news that Ashley was dead.

¶ 35 Dr. Wauter told the secretary to call the police. Appellant glanced at the door several times and the doctor had the impression that he might try to flee. Dr. Wauter pulled a pair of handcuffs out of a drawer and told him, "Just give me your hands." Appellant complied and said, "What's this?" Dr. Wauter personally handcuffed Abshier and told him "You're under arrest." Abshier's demeanor stayed the same.

¶ 36 Police Officer Terry Harrison of the Oklahoma City Police Department Fatality Accident Investigation Squad testified that in his opinion there wasn't any way Ashley's injuries could have been caused by a car hitting her. He examined Ashley's body along with Dr. Wauter at the hospital the day of her death. His conclusion was, "That her wound or her injuries were not consistent with a pedestrian type accident." He had over twenty (20) years experience in accident

investigation, and had investigated well over 5,000 accidents.

¶ 37 Oklahoma City Detective Sam Duke went to the hospital March 30, 1995. He sealed Abshier's car with evidence tape, then took pictures of the exterior. He had another officer stay with the car while he went inside and took pictures of Ashley's body. When the wrecker came, he went back outside and followed Appellant's car to Police Headquarters, where it was secured in the police garage. He also went to the Abshier residence at 1802 South Stonewall, where another officer was standing by guarding it, and secured and photographed the exterior. He also collected boots and other items of clothing and personal property from Abshier. He delivered the evidence he had collected and additional items he had picked up from the medical examiner's office to the police serology department.

¶ 38 Police Officer Charles Goforth, with other officers, searched Appellant's residence and automobile for blood and other physical evidence. He photographed the exterior and interior of both the house and the car and he and the other officers collected all items they found that had apparent evidentiary value, such as blood stains or hairs. Joyce Gilchrist, a forensic chemist for the police department, also helped collect evidence at the house.

¶ 39 Detective Dexter Nelson observed Abshier at the hospital. He was familiar with the behavior of persons under the influence of methamphetamine, and testified that nothing in Abshier's demeanor indicated he was high on methamphetamines. "[Appellant] was calm, quiet, reluctant to speak." Nelson said, "There was no indication that he was high or under the influence of anything, to my knowledge."

¶ 40 Nelson also observed the facial injuries on Ashley's body, and on cross-examination stated: "We didn't know exactly what it was. It did appear that it could have been a—a liquid type burn, a friction burn, or we even considered maybe something being placed on the face and ripped off, like tape." Counsel asked, "You had seen injuries similar to this which were burns, correct?" Nelson answered, "I've seen liquid burns that were similar to this."

¶ 41 Dr. Choi, the medical examiner, testified that in addition to numerous other bruises on her head and body, Ashley had nine different fresh subgaleal (beneath the scalp) hemorrhages. She had died from injury to the head causing swelling of the brain. The skin was denuded from a large area of her face. Dr. Choi said this and the marks on Ashley's face and head appeared consistent with her being held face down by something, such as a shoe, and being stomped. She testified that in her opinion Dr. Wauter's theory, that the application and forceful removal of duct tape from Ashley's face could have caused the removal of the skin, was possible. However she stood by her own theory. Dr. Choi found the fatal injuries consistent with Shaken Baby Syndrome.

¶ 42 During the second stage of trial, the trial court granted the State's motion to incorporate all evidence from the first stage of the trial into the second stage. In addition, the prosecution presented the victim impact statements of April Cockerhan, Ashley's step-grandmother, and of David Cockerhan, Ashley's grandfather. The testimony of each took about one page of transcript, and there was no cross-examination.

¶ 43 Dr. John Stuemky, a pediatrician, testified that the injuries to the child would have been painful, that children Ashley's age do not bruise easier than adults, and that the injuries on Ashley were too numerous to count. He is Board certified in the area of Emergency Pediatrics. He is Chief of the Service of General Pediatrics for Children's Hospital and Medical Director of Emergency Services. He developed the Hospital's child abuse program in the early 1970's and developed the curriculum for child abuse for their medical students as well as their residents of pediatrics.

¶ 44 Dr. Stuemky testified further that one would expect a child to be conscious during most of the injuries because abuse usually starts in response to the infant's crying and whining, and once the child becomes unconscious and stops crying and whining, the abuse also stops. The doctor's testimony was based on over twenty-two (22) years of

experience with abused children, interviews with many, many perpetrators, and from studies in the literature and studies in his own experience.

¶ 45 Appellant presented Dr. Wanda Draper in the second stage who testified about Appellant's history from the records she had reviewed and interviews she had conducted. Although Appellant's natural father was claimed to be an alcoholic and abusive to Appellant's mother, he left when Appellant was still a young child. His mother then married Billy Clock, who was a good stepfather. Appellant had a normal life style until he got into drugs and alcohol in high school. Abshier told her he had used marijuana, crank, methamphetamine, and peyote while in school. He lived with a woman for two years, and they had twin sons. Abshier's mother paid for him to go through a rehabilitation center, but he got involved with marijuana, cocaine, methamphetamine, and other drugs again, and was heavily using methamphetamine at the time of his arrest, or at least several months before. She testified that Abshier and his mother gave inconsistent stories to her about his history.

¶ 46 Dr. Draper said Appellant also gave her multiple stories about what happened the day Ashley was killed. At first, he stuck with his story that Ashley was run over by a car. Later, he told her he had been on "meth" and that he impulsively exploded. He told her that "he hit the child and knocked the child down and knocked the child to the ground," and that he "lost control."

¶ 47 Dr. Philip Murphy testified about neuropsychological examinations of Abshier. His full scale IQ of 83 indicated dull average, and he had a mild learning disability. Tests did not show him to be typically aggressive and did not show him to be an anti-social personality. Nevertheless, if the situation were set up right, Abshier could "blow," and violence would then occur. Use of methamphetamine would make one mean and angry, and there would be a greater tendency to be aggressive under influence of the drug. On cross-examination, he agreed Abshier could

be manipulative. It would not surprise him to hear that Abshier had hit his wife.

¶ 48 Dr. J.R. Smith, the medical director of the psychiatric unit of Integris Hospital, testified for the defense. He had examined Abshier and found he had a history of severe anxiety, intermittent depressive episodes, and severe alcohol and drug dependency.

¶ 49 Appellant told him he was talking on a car phone and was in a rage about some people who owed him money but who had lied to him. (Stephanie had testified that they had no car phone, and the police did not find one in his car or house.) Appellant said because of the rage welling up in him and the methamphetamine he was using, and because Ashley sensed his rage and began whining, he grabbed her by the hair and neck and slammed her down on the floorboard. When Appellant took her into the house, it dawned on him that she was probably dead. He picked up a cloth by the kitchen sink near a can of Drano, wet the rag, and harshly wiped Ashley's face with it; the skin of her face appeared to come off. Dr. Smith admitted on cross examination that parts of Appellant's story were not consistent with the physical evidence and this was one of those parts.[3] Smith said that he believed some of the things Abshier told him, and some of the things he did not believe. Abshier told Dr. Smith he then took the child to his wife's work and then to the hospital.

¶ 50 Dr. Smith did not think that Abshier would be a future threat in prison because it was a controlled setting where he would have no access to methamphetamine and because there were no children in prison.

¶ 51 Abshier's final witness was his mother, Celia Johnson, a private duty nurse. She could not believe Abshier would abuse Ashley. She thought Abshier had many good qualities and was a very loving and dependable person.

## CLAIMED INEFFECTIVE COUNSEL–FIRST STAGE

¶ 52 Appellant contends in his first proposition of error that his trial counsel's

**3.** An extensive search of the house and car by law enforcement did not turn up such a rag or the missing skin from Ashley's face. A plastic bottle of liquid Drano was on the television.

"frank admission of guilt" during voir dire and first stage closing argument deprived Appellant of his right to counsel under the Sixth Amendment to the United States Constitution and his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

 ¶ 53 We have adopted the two-prong test for effective assistance of counsel set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). First, a defendant must show that his attorney's performance was so deficient that the defendant was, in effect, denied counsel as guaranteed by the Sixth Amendment. Second, the defendant must show that the attorney's deficient performance prejudiced the trial to the extent that the defendant was denied a fair trial. *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. *See, e.g., Powell v. State*, 1995 OK CR 37, ¶ 62, 906 P.2d 765, 780, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996).

 ¶ 54 In *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694, the Court held: "Judicial scrutiny of counsel's performance must be highly deferential." Further, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.*

 ¶ 55 Further, "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Counsel has a duty to advocate the defendant's cause, to consult with the defendant on important decisions, and to keep the defendant informed of important developments. *Id.*, 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

¶ 56 Appellant's counsel told the jury during voir dire:

"I feel I at least owe you an explanation for why I went to the heart of the matter, which is the death sentence, and that's because Steven Abshier committed child abuse murder and the State will prove it beyond a reasonable doubt. We are here for sentencing and sentencing only, and this is a horrendous crime that has been committed and the D.A. has the upper hand. I feel like I'm at the foot of a mountain looking up at my goal, which is a fair trial for my client.... I just want to ask you questions and hopefully reach my goal, which is a fair trial for Steven Abshier. And if that occurs, then the justice system has worked."

Trial counsel further told the jury in first stage closing argument:

"[W]e certainly probably could have tried to run some kind of defense, but there's no point in trying to deceive you or make you look like fools by presenting a defense that is not believable, and so we didn't. And we told you that he did it, and I know it's difficult in a case like this as jurors to sit through evidence in the first stage knowing that his lawyer stood up and said he did it, but I felt that that was the way it should have been done and I did it that way."

Appellant claims that this constituted ineffectiveness of counsel, *per se*. We have ruled otherwise on past occasions.

¶ 57 Appellant admits that we did not hold in *Collis v. State*, 1984 OK CR 80, 685 P.2d 975, a non-capital case, that conceding guilt during closing argument was *per se* ineffective. *Id.* at 977. We held in *Wood v. State*, 1998 OK CR 19, ¶ 60, 959 P.2d 1, 16, a capital case:

"In light of the overwhelming evidence against Appellant, trial counsel may have decided not to overstate his case lest he lose credibility for the second stage where he would need it the most. A fine trial lawyer may well decide that guilt could not be doubted and save the best for saving his life. We do not find counsel's performance deficient under the circumstances."

¶ 58 We also held in *Hale v. State*, 1988 OK CR 24, ¶ 48, 750 P.2d 130, 142, another capital case:

"Appellant also claims that counsel admitted his client's guilt during first stage closing arguments. [Footnote: "In closing argument, defense counsel stated, 'There isn't any doubt that Jim Hale was involved in this. No doubt whatsoever. How much though? To what extent?'"] We have held that conciliatory remarks of counsel *may* show ineffective assistance, *Collis v. State*, 685 P.2d 975 (Okl.Cr.1984), but we find nothing prejudicial in counsel's statement. Claiming that the appellant had not been involved at all would have completely destroyed counsel's credibility before the jury in light of overwhelming evidence of appellant's identity and testimony that appellant was apprehended with the ransom money after a chase by law enforcement officials. only possible method of gaining an acquittal on either charge." (Emphasis added.)

¶ 59 We also ruled on counsel's concession of his client's guilt in the case of *Trice v. State*, 1996 OK CR 10, ¶ 19, 912 P.2d 349, 355. "In light of the fact that Trice confessed to having raped the victim, we find that his trial attorneys' strategic decision to concede guilt was neither unreasonable nor prejudicial." Trice was convicted of murdering the same victim he had raped, and was sentenced to death.

·¶ 60 In some circumstances, such as the one here, where the defendant has confessed and the evidence is overwhelming, it could be reasonable trial strategy to candidly concede guilt early in the trial in order to establish credibility with the jury in the hope that at least one juror can be persuaded to vote for a sentence less than death in the penalty stage. It was also reasonable in this case to focus the issues in voir dire to find out which jurors would automatically vote for the death penalty.

¶ 61 It was clear that Abshier could not hope to win in the guilt or innocence stage. He had told a story that Ashley had been hit by a car, but this was controverted by the physical and medical evidence, and police accident experts. He had then changed his story and admitted to at least two witnesses that he had been in a rage and had struck Ashley. It was proper trial strategy for counsel not to destroy his credibility in the first stage, but to focus his efforts on obtaining a "Life Without Parole" sentence rather than "Death." [4]

¶ 62 On the same day *Strickland* was decided, the Supreme Court handed down *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984), a case cited by Appellant in support of his assertion of *per se* ineffective assistance of counsel. In *Cronic*, a complicated bank fraud case with many documentary exhibits, counsel had only been appointed 25 days before trial. The Supreme Court did not decide whether Cronic had been deprived of effective assistance of counsel, but remanded the case for an evidentiary hearing pursuant to *Strickland*. The Court stated in dicta, however, that there were situations, unlike Cronic's, where ineffectiveness of counsel would be presumed. One was where there was no lawyer. Another was where "counsel

---

**4.** The Federal Court of Appeals for the First Circuit has said in a case from the federal court in Massachusetts, *United States v. Gomes*, 177 F.3d 76, 83–84 (1st Cir.1999), where counsel's concession of guilt to one count was evaluated under *Strickland:*

"Counsel's concession was a calculated gamble ... patently a reasonable strategy. The government's case ... was overwhelming." "Further, by avoiding a hopeless claim of innocence on one count, counsel preserved some credibility with the jury for use where it might help. The result was an uphill argument, and it failed, but the tactic was certainly not incompetent representation." "Counsel's concession was not a guilty plea, which involves conviction *without proof,* and is therefore properly hedged with protections. Here, the government had to provide a jury with admissible evidence of guilt and did so in abundance." (Emphasis in original.)

The Supreme Court of California held in *People v. Lucas*, 12 Cal.4th 415, 48 Cal.Rptr.2d 525, 907 P.2d 373, 392 (Cal.1995), *cert. denied,* 519 U.S. 838, 117 S.Ct. 114, 136 L.Ed.2d 66 (1996):

"[I]t is not necessarily incompetent for an attorney to concede his or her client's guilt of a particular offense.... It is also settled that counsel's concession of guilt on one or more charges at the guilt phase of a capital trial is not the equivalent of a guilty plea, requiring defendant's express waiver."

entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* However, the Supreme Court has never ruled that a presumption of ineffectiveness of counsel arises where counsel concedes guilt during trial.

■ ¶ 63 Counsel on appeal next suggests that the statements of trial counsel are equivalent to a plea of guilty on behalf of his client, and that the court should have made a record that the defendant knowingly and voluntarily waived his rights. Appellant says that when a defendant pleads guilty he gives up three important federal rights stated by the Supreme Court in *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969):(1) the privilege against compulsory self-incrimination, (2) the right to trial by jury, and (3) the right to confront one's accusers. However, when listed in this manner, it can be seen that **Appellant did not plead guilty and did not surrender any of these important rights.** He did not testify and did not subject himself to cross-examination; his lawyer vigorously confronted his accusers. He preserved his right to have jury sentencing, and therefore to plead to the jury for mercy.

¶ 64 As a matter of trial strategy, trial counsel admitted only what he knew the State could prove, so that he could maintain his credibility with the jury for the critical second stage. Had Appellant wished to plead guilty in the present case, then the mandates established by this Court in *King v. State*, 1976 OK CR 103, 553 P.2d 529, would have applied. We find from the record that he did not plead guilty, but maintained his right to jury sentencing, to confront and cross-examine the witnesses against him, to not testify, and to not be subjected to cross-examination.[5]

■ ¶ 65 Abshier next claims that trial counsel's admission of guilt was also a violation of Appellant's Fifth and Fourteenth Amendment rights to due process. The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). The government must bear the burden of producing the evidence and convincing the factfinder of a defendant's guilt. *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958). The State was not relieved of its burden in Abshier's case, as the State presented overwhelming evidence of Appellant's guilt. Appellant further remarks that the trial judge may never direct a verdict of guilt, no matter how strong the state's case. To do so would be to deprive the defendant

---

**5.** The Supreme Court of California said in *People v. Cain*, 892 P.2d 1224, 1240–41 (Cal.1995), *cert. denied* 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996):

"We have held trial counsel's decision not to contest, and even expressly to concede, guilt on one or more charges at the guilt phase of a capital trial is not tantamount to a guilty plea requiring a *Boykin Tahl* waiver.... [*Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), and *In re Tahl*, 1 Cal.3d 122, 81 Cal.Rptr. 577, 460 P.2d 449 (1969).] It is not the trial court's duty to inquire whether the defendant agrees with his counsel's decision to make a concession, at least where, as here, there is no explicit indication the defendant disagrees with his attorney's tactical approach to presenting the defense.... Next we turn to defendant's claim his counsel's concessions constituted ineffective assistance of counsel. As we previously have recognized, '[t]o the extent defendant is arguing that it is necessarily incompetence for an attorney to concede his or her client's guilt of murder [or burglary and murder as in this case], the law is otherwise.' ... Furthermore, as pointed out above, the record does not demonstrate counsel ignored 'any express wish on defendant's part to present an active defense' with regard to either the felony-murder or burglary counts.... Defendant also appears to argue his counsel's concessions were an incompetent tactical choice. We disagree. Defendant admitted to the police on tape he was inside the victims' residence when they were murdered and he entered the residence with the intent to steal money. His taped statement was played to the jury. Defendant's admission that he entered the residence for the purpose of stealing money proved his specific intent to commit burglary.... Under the felony-murder rule, his commission of burglary, together with the killing of the victims in the commission of the burglary, made him liable for murder.... Under these circumstances, we cannot conclude counsel was ineffective for candidly admitting defendant's guilt on these counts, while vigorously arguing against defendant's guilt of the special circumstances." (Internal citations omitted.)

of his right to a trial by jury. *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993). However, there was no directed verdict in Abshier's case, and the instructions properly placed the full burden of proof on the State to prove Abshier's guilt.

¶ 66 In this regard, Appellant claims that his trial counsel sided with the State during the trial. Rather, counsel fought hard to save his client's life. By focusing on punishment and not guilt or innocence, he forced jurors to decide during voir dire, while he could still challenge them for cause, whether they could consider a life sentence. He filed and argued over forty-five (45) pre-trial motions, and made objections to testimony and evidence throughout the trial. He tried to prepare every juror during voir dire for the gruesome photographs.

¶ 67 He adroitly used his expert, Dr. Smith, to adopt, repeat, and reinforce testimony of Dr. Stuemky, the State's expert witness that was favorable to Appellant. For example, Dr. Stuemky had said that in his experience, only one or two parents out of 200 who killed their child had actually intended to kill. In closing argument, counsel called Dr. Stuemky "our best witness." Dr. Stuemky was perhaps Abshier's most credible witness because he was called by the State, was not related to Appellant, and was not a paid witness for the defense. Trial counsel effectively argued in second stage closing his client's probable lack of intent to kill as testified to by Smith and Stuemky. Although intent to kill is not an element of First Degree Murder of a Child under § 701.7(C), the lack of such intent could be strong evidence in mitigation. Counsel quickly adapted his defense to this testimony from Dr. Stuemky and skillfully emphasized it in closing argument, while wisely de-emphasizing the weak "excuses" his own expert witnesses had provided.

¶ 68 The effectiveness of his technique in voir dire is shown by Juror Frost being excused after she announced: "From what I've already heard, I don't think I could vote for anything except the death penalty." At least three other jurors who stated they had decided that they would only vote for the death penalty based on what they had heard so far, Dickson, Vaughan, and Faulkenberry, were removed for cause.

¶ 69 The effectiveness of his strategy in voir dire and opening statement also resulted in Juror Higgins being excused from the jury before the second day of testimony. She was crying in the jury box before court proceedings commenced that morning. When questioned *in camera*, she revealed that she had decided that she could not keep an open mind and that "the man [Appellant] should die." This was before any graphic evidence had been introduced. Counsel's voir dire and opening statement had forced her to realize that she would have to face the choice of life or death since he had already told her there would be enough evidence to find Abshier guilty. This kept her from sitting on the final jury that deliberated Abshier's guilt and punishment.

¶ 70 Counsel objected (outside the hearing of the jury) to other-crimes evidence at every opportunity. He objected to the first-stage testimony of Dr. Boone, Curt Been, Lana Jones, Sherrie Casey, and Stephanie Abshier regarding evidence of other crimes. He also objected to the incorporation of their testimony into the second-stage evidence. It is obvious from the record that counsel cared about his client and did not want him to get the death penalty. At trial, he repeated several times his emotionally charged accusation that the state was trying to "kill" his client. The judge threatened him with contempt if he said it again. Counsel was a zealous advocate for his client's cause.

¶ 71 Abshier was not denied due process of law.[6]

6. Appellant cites *Brown v. Rice*, 693 F.Supp. 381, 396 (W.D.N.C.1988), which said: "A lawyer may make a tactical determination of how to run a trial, but the due process clause does not permit the attorney to enter a guilty plea or admit facts [in the second stage of trial] that amount to a guilty plea without the client's consent." However, the cited case was **reversed** by *Brown v. Dixon*, 891 F.2d 490, 498–501 (4th Cir.1989), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990). The court said that counsel, during the penalty phase, could concede to the jury both Brown's guilt of the murders and the existence of two aggravating circumstances with-

¶ 72 Abshier further contends that the record does not affirmatively show his consent to the concession of guilt and that he is therefore entitled to a new trial.[7]

¶ 73 We issued an order pursuant to Appellant's motion for a Rule 3.11 evidentiary hearing on Sixth Amendment claims directing the District Court to conduct an evidentiary hearing and issue "Findings of Fact and Conclusions of Law" on three issues: (1) trial counsel's concessions of guilt prior to and during the first stage of trial; (2) trial counsel's statements during second stage closing arguments; and (3) the failure of trial counsel to contact and use certain witnesses in second stage in mitigation of punishment. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22 O.S., Ch.18, App. (2000). We further directed a determination of whether Appellant **approved** the trial strategy of conceding guilt.

¶ 74 At the evidentiary hearing both Appellant and his trial counsel, Mr. Faulk, testified. Appellant was only asked one question by his attorney, Mr. Lockard, on direct: "Prior to his standing up in front of the jury and telling your jury that you were guilty and that the State would prove it beyond a reasonable doubt, had Mr. Faulk consulted

you about that?" Abshier answered, "No sir he did not. In fact, I was quite shocked."

¶ 75 On cross examination, Appellant was extremely evasive, and could barely remember any other details about the conduct of the trial. For example, he could not remember whether he and his counsel had ever discussed whether he should testify at trial or not. Abshier sat silently during his jury trial while his counsel made concessions in his presence. So far as we know, he has never stated that he opposed or disagreed with the approach used by his counsel-even when Abshier testified at the evidentiary hearing on remand.

¶ 76 At the evidentiary hearing, appellate counsel attempted to strictly limit Appellant's testimony to the first instance where trial counsel conceded the defendant's guilt. Appellant was never asked at the evidentiary hearing whether he **approved** such concessions. He never testified that he agreed or disagreed with the tactic, only that he was surprised when Mr. Faulk first mentioned it to the jury. He did not say whether he and trial counsel ever discussed it after the first time or whether he ever expressed to his counsel any disagreement with the strategy.

out consulting Brown and despite Brown's continuing protestations of innocence.

The Federal Fifth Circuit Court of Appeals has considered a case from Texas where defense counsel's closing argument in the guilt stage was aimed at convincing the jury that defendant's crime was murder, but not capital murder. The court said: "Viewed in context, it is clear that [defense counsel] characterized the murder as brutal and savage in an effort to bolster his credibility with the jury. It was a strategic decision we will not second guess." *Kitchens v. Johnson,* 190 F.3d 698, 704 (5th Cir.1999).

The Fifth Circuit also said in another Texas case, *Carter v. Johnson,* 131 F.3d 452, 466 (5th Cir.1997): "[C]ounsel may make strategic decisions to acknowledge the defendant's culpability and may even concede that the jury would be justified in imposing the death penalty, in order to establish credibility with the jury."

7. Certain cases, from states having no death penalty, cited by Appellant for the proposition that counsel's concession of the defendant's guilt is *per se* ineffective assistance of counsel, are not persuasive in Abshier's case. The jury in those cases only determined guilt or innocence, and not punishment. See *State v. Wiplinger,* 343 N.W.2d 858, 861 (Minn.1984); *Commonwealth v.*

*Triplett,* 398 Mass. 561, 500 N.E.2d 262 (1986); and *People v. Schultz,* 85 Mich.App. 527, 271 N.W.2d 305, 307 (1978). In those cases, there was no viable trial strategy in conceding guilt to a jury—there was no advantage to be gained. The only thing a jury could do to a defendant would be to find him guilty. In *Wiplinger,* 343 N.W.2d at 861, the Supreme Court of Minnesota recognized that their rule might **not** apply in a state where the jury determines punishment as well as guilt or innocence:

"We can think of a few cases where such a strategy might make sense and where a defendant might agree to it.... [One] example is where the attorney's aim in admitting guilt is to increase the chance of a favorable sentence, something that applies particularly in a jurisdiction with jury sentencing."

The *Wiplinger* case is distinguishable from Abshier's case on another ground—the defendant, Wiplinger, **did not** grant permission nor **acquiesce** in his counsel's conduct, but complained to the trial judge about his attorney's representation. The court on appeal in *Wiplinger* said: "[W]e generally believe that if a defense counsel impliedly admits a defendant's guilt without the defendant's permission **or acquiescence,** the defendant should be given a new trial...." *Id.* (emphasis added).

He admitted that Mr. Faulk kept him informed after the trial started as to the events as they were unfolding. Abshier said, "He just told me how the trial was—how it was taking place and how things were going and how the selection of the jury was and so forth." We cannot conclude with certainty from the record, even after the evidentiary hearing on remand, whether counsel consulted with Abshier before making the decision to concede to the jury during voir dire that the State would prove the defendant's guilt. Appellant testified it was not discussed, and counsel testified he did not specifically remember discussing it with his client. He said it was his customary practice to discuss such trial tactics with his client. Counsel had a specific memory of discussing his strategy with four other experienced capital defense lawyers after the first day's voir dire, the evening before he first mentioned it to the jury.

¶ 77 Counsel remembers clearly having numerous discussions with his client on another subject: trying to persuade him to testify in his own behalf.

¶ 78 Putting any reliance upon Abshier's version of events based on this record is problematic. He is the person who will be executed if the sentence of death is affirmed. He had lied to his wife, the emergency room doctor, the police, and, at first, to his own psychiatrist, by claiming Ashley was struck by a car. At the evidentiary hearing he was absolutely clear on only one thing-that Mr. Faulk had not discussed with him in advance his strategy to concede Abshier's guilt to the jury. Abshier was vague and evasive about everything else. Remarkably, he could not even remember whether they discussed whether Abshier would testify on his own behalf at trial.

¶ 79 We find, however, that we have sufficient information to decide Abshier's case without determining whether counsel had discussed this strategy with Abshier and obtained approval in advance.

■ ¶ 80 We find that Appellant acquiesced in the trial strategy of his counsel where he made no effort at any time during the trial to express to the judge his disagreement with the strategy. Later, at formal sentencing, although he was not asked directly if his lawyer had served him well, the trial judge did ask him (after he had been sentenced to death) if there was anything he wanted to say. He said to the judge, "No. That's quite fine. I just want to shake your hand. It's clean. Thank you. I thought you was real fair." Appellant, although he stated at the post-trial evidentiary hearing that he was "shocked" when his counsel made the concession to the jury, never expressed to anyone during the trial, at sentencing, or at the remanded evidentiary hearing that he disagreed with the concession of guilt by his lawyer.

¶ 81 We find that the strategy to concede defendant's guilt to the jury, while preserving his right to jury sentencing, contesting (outside the presence of the jury) all evidence that might be prejudicial to his client, vigorously cross-examining the State's witnesses, presenting in defense the testimony of three (3) expert witnesses and the defendant's mother, attempting to persuade the defendant to testify on his own behalf to ask for mercy, and concentrating his closing argument on three main themes: (1) his plea for a sentence of "Life Without Parole" instead of "Death," (2) Abshier's lack of intent to kill, and (3) Abshier's assumption of responsibility for Ashley's death by admitting to his psychiatrist that "he did it," was not only reasonable trial strategy of effective counsel but was probably the best strategy he could have pursued under the circumstances to try to obtain a sentence less than death.

¶ 82 We find that the performance of trial counsel in this case fell within the wide range of reasonable professional assistance required by the Constitution, and that Abshier acquiesced in the reasonable trial strategy embarked upon by his counsel. The performance of counsel was not deficient, and there was no prejudice. Appellant's first proposition is denied.

### INEFFECTIVENESS OF COUNSEL— SECOND STAGE CLOSING

¶ 83 In Proposition Fourteen, Appellant claims his trial counsel, Ms. Sanders and Mr. Faulk, were ineffective due to statements in

second stage closing argument, listed below, which were prejudicial and adverse to his interest.

¶ 84 In our order remanding for an evidentiary hearing on Sixth Amendment grounds, we asked the trial court to hear evidence and make findings of fact and conclusions of law on this issue.

¶ 85 Appellant complains that trial counsel was ineffective when the following statements were made in the second stage closing argument by Ms. Sanders: "From' the time Ashley was born, this child did not have a chance in this world. The child had no one in her life to protect her.... Everybody in this case seemed to be protecting themselves."

¶ 86 Appellant complains that trial counsel was ineffective in closing argument of the second stage proceedings when Mr. Faulk:

1. Referred to mitigation evidence as "excuses" that did not reduce Appellant's responsibility,

2. Conceded two aggravating circumstances,

3. Told the jury not to consider a life sentence,

4. Stated several times that Appellant had lied and in fact was "lying like a fool at the start of this,"

5. Said, "He couldn't even take the stand to tell you he did it," and

6. Told the jury to give Appellant the most extreme punishment-life without parole.

¶ 87 The "District Court Findings of Fact and Conclusions of Law" found that the comments of counsel were based on reasonable trial strategy:

"Faced with overwhelming evidence of guilt, the primary goal or strategy of both Mr. Faulk and Ms. Sanders was to save the defendant's life. It was determined by trial counsel that a means to that end was to establish a certain rapport with the jury and be candid with the jury, thinking that such a strategy would entice the jury into sparing the defendant's life.... Because this strategy was not successful does not make it unsound or unreasonable."

¶ 88 Ms. Sanders testified that she made her statement to get the jurors' attention. She believed that Ashley "did not have a chance in this world" and that several persons were at fault for not protecting her. Mr. Faulk used candor to try and convince the jurors to spare his client's life. He asked them not to consider "Life" because he was sure they weren't going to anyway. He tried to convince the jury that "Life Without Parole" was the most extreme punishment because the murderer would have the rest of his life to think about what he had done. Counsel told the jury, "[I]f you send him to prison on a Life Without Parole, he'll have to think about it and he'll have to deal with it."

¶ 89 Mr. Faulk's reference to defenses as "excuses" would strike a chord with many jurors who might consider the use of methamphetamines a poor excuse for taking the life of a child. Counsel's statement was accurate when he said that Abshier lied like a fool when Abshier had claimed a car ran over Ashley. However, this was mentioned to emphasize that he subsequently told the truth. In context, counsel said:

"Dr. Stuemky also said that child abusers have a difficult time admitting what they did, and I think Dr. J.R. Smith also said that. He has gone from lying like a fool at the start of this to at least acknowledging that he did it. He couldn't even take the stand to tell you he did it. He doesn't have the-the nerve, but he told Dr. J.R. Smith that he did it and he didn't give him all the details and that's because he's in denial. But if you send him to prison on a Life Without Parole, he'll have to think about it and he'll have to deal with it."

This was a reasonable strategy in light of the fact that Appellant's first version of the facts was overwhelmingly contradicted by the evidence. Counsel's statement that Appellant had acknowledged that "he did it" is analogous to the facts of *Strickland v. Washington, supra.* Washington's counsel made a strategic choice "to rely as fully as possible on respondent's acceptance of responsibility for his crimes," where "the trial judge's views on the importance of owning up to one's crimes were well known to counsel." Abshier's Counsel also reasonably concluded

that a jury would prefer to hear that Abshier had taken responsibility for his actions. Counsel correctly stated that Appellant didn't take the stand to tell them he did it but used defense experts to testify that Abshier had confessed to them. In this manner, counsel informed the jury that Abshier was no longer lying, but had admitted the truth.

¶ 90 Contrary to Appellant's allegation on appeal, trial counsel did not completely stipulate to the first aggravator, "especially heinous, atrocious, and cruel." Counsel said,

"I don't know. Probably. I'm not going to say anything about that as far as trying to convince you that this isn't probably heinous, atrocious, and cruel. The way that child was beaten, the way her face looked, that's-you know, that's for you to decide."

This was a reasonable strategy to show the jurors that Abshier was taking responsibility for what he had done, which was more likely to make a favorable impression than telling more lies and denying the obvious.

¶ 91 Nor did counsel completely concede the second aggravator, but said:

"Continuing threat. He is a continuing threat if he remains on meth and is allowed around child[ren] or defenseless people. But in—prison society, he's a threat to no one."

This argument reiterated Dr. Smith's expert witness testimony that he did not think that Abshier would be a future threat in prison "because it was a controlled setting where he would have no access to methamphetamine and because there were no children in prison." Counsel's argument was that children and people outside the penitentiary could be protected from violence by a sentence of Life Without Parole.

¶ 92 The Fourth Circuit said in *Brown v. Dixon,* 891 F.2d 490, 499–500 (4th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990), that during the penalty phase counsel could concede to the jury both Brown's guilt of the murders [which the jury had already found] and the existence of two aggravating circumstances without consult-

ing Brown and despite Brown's continuing protestations of innocence. The statements by Abshier's counsel in closing argument were not outside the scope of reasonably effective representation, and unlike closing statements made in *Brown,* were not contrary to his client's position at trial. We concur with the trial court's finding at the evidentiary hearing that these comments of counsel in the second stage closing argument were based on reasonable trial strategy. There is no error here.

¶ 93 Trial counsel was an experienced trial lawyer who could determine where best to place his emphasis in closing argument, and we should not second-guess his strategy in hind-sight. He adroitly used his expert, Dr. Smith, to adopt, repeat, and reinforce testimony of Dr. Stuemky, the State's expert witness, that was favorable to Appellant. Trial counsel effectively argued in mitigation during the second stage closing argument his client's probable lack of intent to kill as testified to by Smith and Stuemky. Finally, he asked for mercy for his client: "And all I ask is that if you don't feel Life Without Parole is harsh enough punishment, then I would ask that you extend mercy to him and spare his life."

¶ 94 In the second stage argument, counsel clearly had one objective which he sought with diligence-to try to avoid the death penalty for his client. Appellant's fourteenth proposition is denied.

## INEFFECTIVENESS OF COUNSEL– MITIGATION WITNESSES

¶ 95 Appellant's Application for Evidentiary Hearing on Sixth Amendment Claims also claimed that trial counsel's ineffective performance was demonstrated by his failure to investigate and utilize existing mitigating evidence in the second stage of his trial. He attached three affidavits in support of the Application. One was from Abshier's former girlfriend—Brenda McGilberry—the mother of his twin sons. Another was from his former step-father, Billy Clock. The third was from his former sister-in-law, Teresa Abshier. Each claimed they would have testified if they had been asked, yet none of these affiants claim that they contacted Ab-

shier's trial attorney to offer to help during the nearly three (3) years between Appellant's arrest and his trial. No affidavit has been provided from Appellant that he advised his counsel of the existence or names of these potential witnesses.

¶ 96 Abshier's former girlfriend, Brenda McGilberry, who Abshier had lived with for two or three years before he met Stephanie, claimed in her affidavit that Abshier was good to Ashley and other children. Defense witness, Dr. Wanda Draper, Ph.D. testified at trial that she had tried to find Brenda, as well as Billy Clock, and had not been able to locate them before trial. They were found after trial and stated in their affidavits that they would have testified if they had been asked.

¶ 97 By the time of the evidentiary hearing held in August 2000, Brenda McGilberry was subpoenaed but did not appear. Appellate counsel conceded in his Supplemental Brief after Evidentiary Hearing that the District Court correctly concluded that "the defendant has failed to establish that Ms. McGilberry would have been available as a witness at the time of trial and thus has failed to show trial counsel was ineffective for failure to present this witness at trial."

¶ 98 Appellant found another witness before the evidentiary hearing, his 17–year-old nephew Paul Abshier, the son of Teresa Abshier. Paul would have been about 14 years old at the time of trial. When he was between five and ten years old, he was around Abshier a lot. His uncle played with him and always had a smile. He saw Ashley asleep on his uncle's lap once. We do not see how failure of trial counsel to discover this witness by the time of trial in January 1998, could prove ineffective assistance of trial counsel. Paul's existence was always known to Appellant, although appellate counsel only discovered him two months before the evidentiary hearing held in August 2000.

¶ 99 Since three (3) experts and Abshier's mother testified at trial about his family history and childhood, and prior drug use, the information reflected in the affidavits and at the evidentiary hearing would be merely cumulative and would not have affected the outcome of the trial. None of the relatives testifying at the evidentiary hearing claimed to have personal knowledge of events occurring on the date of Ashley's death.

¶ 100 The affiants' assertions that Abshier was good to Ashley and other children would carry little weight compared to the number and severity of her injuries, and his admissions that he was alone with her during the day when these injuries occurred and that he had knocked her to the ground and into the floorboard of his car.

¶ 101 Although Appellant claimed to Dr. Smith that he killed Ashley while using methamphetamines, numerous witnesses saw him before and after Ashley's death on the day she died and testified that he exhibited no symptoms of methamphetamine use. In fact, he slept so soundly between 4:30 and 9:00 a.m. that Stephanie could not awaken him, he was asking for food at lunch time, and he was calm at the hospital, not hyper. These symptoms are contra-indications of recent ingestion of methamphetamine which normally causes sleeplessness, loss of appetite, and hyperactivity or fidgety nerves. Stephanie, who was familiar with his behavior when he was using methamphetamine, testified he had not used any for about a month. Thus Appellant's proffered testimony in his application for evidentiary hearing that he used drugs on other occasions would not have been persuasive as to his drug use on the day of the murder.

¶ 102 While a duty is placed on defense counsel to investigate the existence of possible defense witnesses in capital cases, this does not mean that the defendant has no responsibility to cooperate with and assist his counsel in identifying potential witnesses. The Supreme Court said in *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695–96:

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are

reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigative decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."

We note that counsel called one relative to testify at trial in Appellant's behalf. Then on appeal more relatives, or former relatives, signed affidavits that they were not contacted but had highly relevant evidence to present in mitigation. The existence of these witnesses was known to Appellant at the time of trial.

¶ 103 Appellate counsel suggests trial counsel should have spent more time repeating his own witnesses' theories about Abshier's unfortunate childhood. However, the evidence was weak as to any unfortunate childhood. Appellant had a good step-father who took him fishing. He had a normal life style until he got into drugs and alcohol in high school. We find no error here.

### VOIR DIRE ISSUES

¶ 104 Appellant claims in Proposition Two that prospective juror Copeland could not consider all three punishments available for First Degree Murder, that is, Life, Life without Parole, or Death. Further, Appellant asserts that Copeland should have been excused for cause because he seemed hostile to Appellant's mitigation defense of voluntary drug use.

¶ 105 At one point when the trial court asked Copeland if he were seated on a jury panel that found a defendant guilty of Murder in the First Degree, could he consider all three of the legal punishments and

impose the one warranted by the law and the evidence? Mr. Copeland answered, "Yes ma'am." The court then asked him, "You have no reservations about that?" He answered, "Just maybe slight reservation as far as being a child abuse murder and relying on not having the responsibility, but turning to drugs or alcohol to—to excuse yourself. And if that were the case, I could honestly say that I would not consider anything less than the death penalty."

¶ 106 Copeland said this was based on the statements he had heard so far as to what the evidence would be. The court then asked him, "Do you believe that you could go into jury deliberations—into this trial and the jury deliberations with an open mind and rely on the evidence that you hear in making the decision that you will ultimately make?" He answered, "Yes Ma'am." The judge then asked, "And in the course of making that decision, after hearing all the evidence, can you consider all three of the legal punishments?" He answered, "I could definitely consider them."

¶ 107 The trial court did not abuse its discretion in refusing to excuse Juror Copeland for cause because he stated that he could consider all three punishments, including life, life without parole, and death. He said he could consider life: "I would definitely consider it. I would definitely keep an open mind about the whole situation."

¶ 108 Copeland agreed that it would be real important in the jury room to respect the views of the other jurors, and that he should not "bulldog" someone into accepting his opinion. Counsel asked, "Do you believe in your heart, in your mind right now, that you can actually look at a life sentence and give it fair and honest consideration in a child abuse murder?" Copeland answered, "It would just depend on the situation and the evidence, like everybody else says. I would definitely consider it. I would definitely keep an open mind about the whole situation."

¶ 109 Defense counsel asked him, "Do you understand that in a death penalty case, in a death penalty case only, that you may consider mercy as a factor?" He answered, "Yes." Counsel then asked him, "Do you have any

problem with that?" Mr. Copeland answered, "I have no problems with giving mercy at all."

¶ 110 Where juror stated he could consider all three punishments, imprisonment for life, imprisonment for life without parole, and death as provided by law, Appellant was not entitled to have him excused for cause. We held in *Humphreys v. State,* 1997 OK CR 59, ¶ 6, 947 P.2d 565, 570:

> "The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown. *Spears v. State,* 900 P.2d 431, 437 (Okl.Cr.), cert. denied, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995); *Allen v. State,* 862 P.2d 487, 491 (Okl.Cr.1993), cert. denied, 511 U.S. 1075, 114 S.Ct. 1657, 128 L.Ed.2d 375 (1994). To determine if the trial court properly excused a prospective juror for cause, this Court will review the entirety of the juror's voir dire examination. *Carter v. State,* 879 P.2d 1234, 1244 (Okl.Cr.1994), cert. denied, 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995). To withstand a challenge for cause concerning punishment issues, a venireperson must be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun. *Carter,* 879 P.2d at 1244."

¶ 111 We have reviewed the entirety of prospective juror Copeland's voir dire examination and find no reversible error in refusing to excuse Copeland for cause.

■ ¶ 112 Furthermore, Appellant used his seventh peremptory challenge to excuse prospective juror Copeland, and therefore Mr. Copeland did not actually sit on Abshier's jury. Defense counsel stated at trial that Copeland was the only prospective juror which he removed on a peremptory challenge that he had unsuccessfully challenged for cause.

¶ 113 We have held:

"The failure of the trial court to remove a prospective juror who unequivocally states that he is unwilling to follow the law during the penalty phase by considering a life sentence is error. The record reflects that defense counsel challenged the prospective juror for cause, and when the court denied the challenge, defense counsel used a peremptory challenge. All of appellant's peremptory challenges were subsequently used; but as there is nothing in the record to show that any juror who sat on the trial was objectionable, we are unable to discover any grounds for reversal." (Citations omitted.) *Ross v. State,* 1986 OK CR 49, ¶ 11, 717 P.2d 117, 120, *aff'd sub nom Ross v. Oklahoma,* 487 U.S. 81, 83 84, 108 S.Ct. 2273, 2276, 101 L.Ed.2d 80, 87 (1988).

In affirming *Ross v. State,* the U.S. Supreme Court said:

> "On further examination by defense counsel, [Prospective Juror] Huling declared that if the jury found petitioner guilty, he would vote to impose death automatically. Defense counsel moved to have Huling removed for cause, arguing that Huling would not be able to follow the law at the penalty phase. The trial court denied the motion and Huling was provisionally seated. The defense then exercised its sixth peremptory challenge to remove Huling. The defense ultimately used all nine of its challenges.... None of the 12 jurors who actually sat and decided petitioner's fate was challenged for cause by defense counsel." *Ross v. Oklahoma,* 487 U.S. 81, 83–84, 108 S.Ct. 2273, 2276, 101 L.Ed.2d 80, 87 (1988).

The Supreme Court further said in *Ross v. Oklahoma:*

> "Any claim that the jury was not impartial, therefore, must focus not on Huling, but on the jurors who ultimately sat. None of those 12 jurors, however, was challenged for cause by petitioner, and he has never suggested that any of the 12 was not impartial.... We conclude that petitioner has failed to establish that the jury was not impartial." *Ross,* 487 U.S. at 86, 108 S.Ct. at 2277, 101 L.Ed.2d at 88 (1988).[8]

---

8. The United States Supreme Court recently extended its holding in *Ross* to trials in federal courts under Rule 24 of the Federal Rules of Criminal Procedure. *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 780–81, 145 L.Ed.2d 792 (2000).

**604**

¶ 114 Counsel did advise the trial court, after he had exhausted his peremptory challenges, that if he had not had to use a peremptory challenge on Prospective Juror Copeland, he would have used that peremptory challenge to excuse Prospective Juror Blansett "because her position on the death penalty was very strong." However, he never moved to excuse Blansett for cause. **In fact, he specifically passed her for cause.** After he had passed Ms. Blansett for cause, he used his peremptory challenges numbers 4, 5, 6, 8 and 9 to excuse other jurors whom he did not challenge for cause. (He used his peremptory challenge number 7 to excuse Mr. Copeland who he had unsuccessfully challenged for cause.) Since Abshier excused five (5) prospective jurors whom he did not challenge for cause after Blansett was seated, and did not move to strike Blansett for cause, he has not preserved his record of any prejudice in Blansett sitting as a juror in his case.

¶ 115 The trial court did not err in refusing to excuse Copeland for cause, but even if the refusal were to be considered error, Appellant has failed to preserve any such error for appellate review. His second proposition is denied.

### DR. STUEMKY'S OPINION—HOW LONG WAS VICTIM CONSCIOUS

¶ 116 Appellant complains in Proposition Three that Dr. Stuemky should not have been allowed to testify about his expert opinion that the child was conscious and crying during the beating she received from Abshier. Dr. Stuemky testified that one would expect a child to be conscious during most of the injuries because abuse usually starts because of the infant's crying and whining, and once the child becomes unconscious and stops crying and whining, the abuse stops too. The doctor's testimony was based on over twenty-two (22) years of experience with abused children, interviews with "many, many perpetrators," and from studies in the literature and studies in his own experience. His testimony was corroborated by Appellant's story to Dr. Smith that Ashley sensed his rage and began whining and he hit her very hard. It was also corroborated by Stephanie's testimony that Appellant hit Ashley and cussed at her when Ashley was crying in the car at Wal–Mart in October 1994.

¶ 117 Dr. Stuemky was no less qualified to testify about this than he was qualified to testify about his opinion based on his experience that only one or two persons out of 200 who had killed children had actually intended to do so. This testimony was favorable to the Appellant, and appellate counsel does not contend this testimony or line of questioning was error.

¶ 118 Generally, expert testimony is admissible where the witness's specialized knowledge will assist the jury in understanding the evidence or determining a fact in issue; provided that the witness is qualified as an expert by knowledge, skill, experience, training, or education. 12 O.S.1981, § 2702.

¶ 119 The decision of whether an expert witness is allowed to testify rests within the discretion of the trial court and its decision will not be upset by this Court in the absence of abuse of its discretion. *Barnhart v. State*, 1977 OK CR 18, 559 P.2d 451; *Roubideaux v. State*, 1985 OK CR 105, 707 P.2d 35, 39.

¶ 120 This Court has acknowledged the existence of the Child Abuse Syndrome and has allowed expert testimony to assist the jury in understanding child abuse evidence. *Raymond v. State*, 1986 OK CR 51, ¶ 4, 717 P.2d 1147, 1149; *Rice v. State*, 1983 OK CR 97, ¶ 7, 666 P.2d 233, 234. An expert opinion is not objectionable merely "because it embraces an ultimate issue to be decided by the trier of fact." 12 O.S.1981, § 2704. But see *Hooks v. State*, 1993 OK CR 41, ¶¶ 11–16, 862 P.2d 1273, and *Gabus v. Harvey*, 1984 OK 4, 678 P.2d 253.

¶ 121 Dr. Stuemky's testimony was properly admitted, and Appellant's third proposition is denied.

### EARLIER INSTANCES OF ABUSE— VICTIM'S BROKEN ARM

¶ 122 In Proposition Four Appellant complains that the *Burks* notice failed to

specify what grounds existed for admission of evidence of other crimes. Actually, the complaint is that the State specified too many grounds. Appellant alleged that this did not give him notice of which theory to prepare for. When the trial court asked counsel how he was harmed by the State's notice, he said, "The argument is strained, Your Honor, I admit." The State maintained that most of the exceptions were applicable except perhaps "preparation." Notice should specify at least one of the grounds and should specify all those that are reasonably applicable.

¶ 123 Prior acts admitted to show absence of mistake or accident are relevant, and not admitted merely to show the defendant's bad character. We held in *Gideon v. State,* 1986 OK CR 112, ¶ 9, 721 P.2d 1336, 1338, a child abuse case:

> "While the general rule is to exclude evidence of other crimes, an exception applies where the evidence of prior injuries is admitted to prove the absence of mistake or accident. 12 O.S.1981 § 2404(B). Here, the critical issue was whether the injuries resulted from abuse or whether they happened accidentally as the appellant claimed. This Court has consistently held that, in cases of this nature, past injuries are admissible to rebut any claim that the latest injury occurred through accident or simple negligence. *Freeman v. State,* 681 P.2d 84, 86 (Okl.Cr.1984); *White v. State,* 607 P.2d 713, 715 (Okl.Cr.1980); *Ashford v. State,* 603 P.2d 1162, 1164 (Okl. Cr.1979)."

¶ 124 Prior acts of abuse against a child can be admissible to show the defendant's attitude and feeling of malice against the decedent, even if it consists of evidence of other crimes. *Revilla v. State,* 1994 OK CR 24, 877 P.2d 1143, 1152.

¶ 125 Appellant claims there is a fatal variance between the *Burks* notice and the proof at trial. The notice indicated that Appellant had slung Ashley by the arm and into a wall and broke her arm. The proof was that he jerked her by the arm over a car seat and, either by that act or another act around that same time, broke her arm. Another notice said that he kicked her, abused her with his hands, and pushed her from a car. The proof was that he kicked her to the ground, placed many bruises on her body, and that she was either pushed or fell out of the car seat from beside Abshier onto the ground. We find that the notice was sufficient.

¶ 126 Appellant claims that intent was not "genuinely" an issue because intent in a general intent crime is presumed from the commission of the crime itself. This argument ignores the fact that in a case of First Degree Murder of a Child under § 701.7(C), the burden is on the State to prove beyond a reasonable doubt that the defendant acted "willfully" or "maliciously." *Fairchild v. State,* 1999 OK CR 49, ¶ 49, 998 P.2d 611, 622 (Opinion on Rehearing).

¶ 127 Evidence of prior acts of violence by Appellant against this child was also admissible to rebut the statement Appellant had made to law enforcement that Ashley was the victim of an automobile-pedestrian accident. Appellant's fourth proposition has no merit.

## VICTIM–IMPACT EVIDENCE PRESENTED BY GRANDPARENTS

¶ 128 In Proposition Five, the Appellant complains that two victim impact statements read by the grandparents in the sentencing stage should not have been allowed. At trial, Appellant objected that the victim impact statute in Oklahoma was unconstitutional and that the statements which had been provided to him contained hearsay. His objections were overruled. The State voluntarily redacted a portion of one of the statements about how Ashley died and the impact of her death on her mother, Stephanie. Appellant for the first time on appeal objects to the statements on the ground that grandparents were not authorized by law to present the statements at trial, and that the effects on family members other than the "immediate family members" were improperly included within the statements. When Appellant objects on one ground at trial, he cannot assert a different ground on appeal. In *Bennett v. State,* 1982 OK CR 161, ¶ 15, 652 P.2d 1237, 1240, we held that a defendant

waived his right to assert error on appeal because no specific contemporaneous objection was made at the time of the alleged error as required by 12 O.S.1981, § 2104(A)(1). *Moss v. State*, 1994 OK CR 80, ¶ 42, 888 P.2d 509, 519. Since there were no contemporaneous objections on the grounds now asserted, we examine for plain error only.

¶ 129 Appellant does not claim surprise as he was provided with notice and with copies of the grandparents' written statements before trial. They were sworn to testify, merely answered questions about their identity and relationship to Ashley, and then read their written statements as an oral narrative under oath. They did not describe the manner of Ashley's death and made no recommendation as to a sentence for Appellant. They were available to be cross-examined, but Appellant's counsel waived any cross-examination.

¶ 130 Appellant concedes that, "Although the Cockerhan's [the grandparents] may have been able to properly sponsor victim impact evidence as 'persons designated by the victim or by family members of the victim' there is nothing in the record to indicate that this was the case."

¶ 131 Although the statement read by the Grandmother, Mrs. Cockerhan, states that it is written "on behalf of Ashley Abshier's family," nothing in the record indicates that either Mr. or Mrs. Cockerhan were designated by immediate family members of the victim to give victim impact testimony under the provisions of Title 22 O.S. Supp.1998, § 984. Further, both written statements include brief statements of the effect of the death of Ashley Abshier on family members other than "members of the immediate family" as defined by § 984.

¶ 132 This Court said in *Hooks v. State*, 2001 OK CR 1, ¶ 36, 19 P.3d 294, 313, that we would "not presume, in the face of a silent record," that a victim impact witness was the family's designated representative. This Court's pronouncements in *Cargle v. State*, 1995 OK CR 77, 909 P.2d 806, *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), continue to guide our

review of victim impact testimony. We find nothing in the improperly admitted victim impact testimony that "improperly weighted the scales" in the trial. We find that the statements were extremely short, far less emotional than the factual details of the death already in evidence, and of little or no weight in and of themselves. We cannot say these brief, isolated statements caused the verdict to be the result of an unreasonable emotional response. *Cargle, supra; Hooks, supra.* We find no plain error. Appellant argues that this error could not be found to be harmless, which argument we reject. Even if this error had been preserved for appellate review, it would clearly have been harmless. *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690.

¶ 133 Appellant's argument that victim impact evidence operates as a "superaggravator" we have rejected repeatedly and continue to reject. *Toles v. State*, 1997 OK CR 45, ¶ 36, 947 P.2d 180; *Cargle*, 1995 OK CR 77, 909 P.2d 806, 826; *Hooks v. State*, 2001 OK CR 1, ¶ 38, 19 P.3d at 313.

¶ 134 We deny Appellant's fifth proposition.

## COLOR PHOTOGRAPHS OF HOMICIDE VICTIM'S BODY

¶ 135 Appellant complains in his Proposition Six that the twenty-two (22) color photographs of Ashley's body admitted into evidence are "particularly gruesome" and violated Abshier's rights because they "repeatedly depict the battered and bruised body of the child victim." It would also be accurate to say, these photographs depict the *repeatedly* battered and bruised body of the child victim.

¶ 136 The only thing that is particularly gruesome about the pictures is the denuded face of the child with a layer of skin missing. Considering the mystery about how Abshier removed the skin from Ashley's face, it was extremely important for the triers of fact to have as accurate a picture of this injury as possible. These pictures were made before any autopsy incisions and depict Ashley's lifeless body as she appeared when

Abshier brought her into the emergency room. The child had been dead for two or more hours when she was brought in. The photographs were only 5×8 inches, with a white 7×9 inch backing, and were not physically passed among the jurors in the courtroom. They were displayed one at a time on a 25 or 27–inch television screen in the court room and the trial judge required that they be displayed only as long as was necessary for the witness to testify about them.

¶ 137 As we said recently in the case of *Fairchild v. State*, 1999 OK CR 49, ¶ 80, 998 P.2d 611, 628 (Opinion on Rehearing): "[M]any pictures were necessary to show the large number of injuries inflicted on different parts of [the child's] head and body." This is also true in Abshier's case. There were nine (9) severe contusions to Ashley's scalp alone, including a heel mark on the back of her head. The photographs corroborated the medical examiner's and emergency room doctor's testimony and were particularly relevant to rebut Abshier's story that Ashley had been hit by a car.

¶ 138 We hold that the admission of these photographs was not error.

## SAME CONDUCT SUPPORTING GUILT AND AGGRAVATOR

¶ 139 In Proposition Seven, Appellant asserts that his right not to be punished twice, guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Art. II, § 21, of the Oklahoma Constitution, as well as by 21 O.S.1991, § 11(A), was violated when the same evidence used to convict him of First Degree Murder of a Child in the first stage of his trial was also used during the second stage of the trial to sentence him to death.

¶ 140 As the first stage of Abshier's capital trial was the guilt or innocence stage and not a punishment stage, the defendant's right not to be subjected to double punishment under the Double Jeopardy Clauses was not violated. He only received one punishment, the punishment of Death.

¶ 141 In *Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988), the United States Supreme Court

said regarding the Louisiana death penalty scheme, which does not use aggravating circumstances in the sentencing stage, but uses a narrow definition in the guilt stage:

"To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); cf. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death."

¶ 142 We recently answered this same proposition in another case involving First Degree Murder of a Child, *Fairchild*, 1999 OK CR 49, ¶¶ 81–82, 998 P.2d at 628 (Opinion on Rehearing):

"Double jeopardy concerns are not triggered by the use of the same evidence to prove guilt and impose punishment, for the finding of guilt is merely a necessary condition for imposing a single punishment. *See Lowenfield v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546, 553, 98 L.Ed.2d 568, 583 (1988). Likewise, Section 11(A) is not implicated either."

¶ 143 In Oklahoma, the death penalty scheme for 21 O.S.Supp.1999 § 701.7(C) is narrowed in both the guilt or innocence stage and the punishment stage of trial. In the guilt or innocence stage, the state must prove: (1) that the victim is a child, (2) that the perpetrator willfully used unreasonable force upon the child, resulting in the death of the child, or willfully committed an act which caused injury to the child, resulting in the death of the child, and (3) if the perpetrator is a parent, teacher, or other person authorized to discipline the child, that the force used was more than that ordinarily used as a means of discipline. In the punishment stage, before the jury can sentence a convicted murderer to death, it must additionally find that one or more statutorily enumerated aggravating circumstances exist beyond a

reasonable doubt, and that the aggravating circumstance or circumstances are not outweighed by any proven mitigating circumstances.

¶ 144 The class of persons eligible to receive a punishment of death is further narrowed in Oklahoma by the restriction that, unless jury trial is waived by the defendant or he has pled guilty, only a unanimous 12 member jury of the defendant's peers can set punishment at death. *Fields v. State*, 1996 OK CR 35, ¶ 29, 923 P.2d 624, 630; 21 O.S.1991, §§ 701.10(B), 701.11. If a defendant has not waived his right to jury sentencing, and the jury cannot unanimously agree on punishment, then the judge may set punishment no greater than imprisonment for "Life" or "Life Without Parole." *Id.* § 701.11. The right to jury sentencing, and to unanimous jury sentencing, are rights guaranteed to capital defendants in Oklahoma that extend beyond those rights guaranteed by the United States Constitution. *See, for example, Tison v. Arizona*, 481 U.S. 137, 142, 107 S.Ct. 1676, 1680, 95 L.Ed.2d 127, 134 (1987) (Arizona law provided for a capital sentencing proceeding to be conducted without a jury); *Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 1898–99, 141 L.Ed.2d 76, 82 (1998) (in Nebraska, three-judge sentencing panel convened to consider aggravating and mitigating circumstances and sentenced respondent to death).

¶ 145 Appellant's seventh proposition is without merit.

### *ENMUND, TISON, LOVING,* AND *REEVES* THRESHOLD.

¶ 146 First Degree Murder of a Child requires proof of a willful or malicious action by the perpetrator or perpetrators resulting in the death of a child, either by use of unreasonable force upon the child or by any act which results in injury to the child. In First Degree Murder of a Child, the willful acts of the perpetrator cause the death. This requires an intentional act rather than an accidental or inadvertent act, but requires no specific intent to kill or injure.

¶ 147 Like First Degree Malice Murder and First Degree Felony Murder, First Degree Murder of a Child may be punished by death only if one or more statutory aggravating circumstances are proven, and they are not outweighed by any proven mitigating circumstances. In *McCracken v. State*, 1994 OK CR 68, ¶¶ 34–37, 887 P.2d 323, 331–332, we held that even "a vicarious felony murderer may be sentenced to death absent an intent to kill, if sufficient aggravating circumstances exist." There were no dissents to that holding. Certainly that holding would be no less applicable in a case where a murderer directly and personally kills a child, in violation of § 701.7(C), if a sufficient aggravating circumstance or circumstances exist that are not outweighed by any mitigating circumstances.

¶ 148 The Supreme Court has held that a State may not sentence a defendant to death "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982); *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 693, 88 L.Ed.2d 704 (1986). In 1987, *Tison v. Arizona*, 481 U.S. 137, 157–158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127, 134 (1987), extended the *Enmund* rule to authorize the death penalty also for a felony-murder defendant who did not personally kill but "who was a major participant in a felony and exhibited reckless indifference to human life." *Tison* held:

"Only a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, and we do not find this minority position constitutionally required." *Tison*, 481 U.S. at 158, 107 S.Ct. at 1688.

¶ 149 In *Enmund, Bullock,* and *Tison,* the Supreme Court addressed the applicability of the death penalty to an accomplice in a murder case who did not actually inflict the fatal wound. In Abshier's case, we have a defendant who himself, acting alone, actually killed. Therefore, the requirements of *Enmund, Bullock,* and *Tison* do not apply, and we need not determine whether Appellant was a "major participant in a felony and exhibited reckless indifference to human life"—he was the only participant. In *Wis-*

*dom v. State,* 1996 OK CR 22, ¶ 38–40, 918 P.2d 384, 395, we decided this precise issue, distinguishing *Tison* and *Enmund,* since Wisdom was the person who actually killed a three-year-old boy by "willful use of unreasonable force." *See also Fairchild,* 1999 OK CR 49, ¶¶ 98, 998 P.2d 611, 630. In *Crawford v. State,* 1992 OK CR 62, ¶ 65, 840 P.2d 627, 640, we held that a jury need not specify whether the first degree murder conviction was based on malice aforethought or "during the commission of a felony," and need not make a finding of the defendant's intent to kill, "especially in light of the fact that [Crawford] acted alone in the commission of this offense." The *Crawford* interpretation of *Enmund* and *Tison* was unanimously cited with approval by this Court in *Powell v. State,* 1995 OK CR 37, ¶ 38, 906 P.2d 765, 776, where we held that "Powell was not entitled to an *Enmund* instruction."

¶ 150 In the United States Supreme Court opinion in *Loving v. United States,* 517 U.S. 748, 116 S.Ct. 1737, 1742, 135 L.Ed.2d 36 (1996), cited in Abshier's brief, the Supreme Court held that the President of the United States may prescribe aggravating factors in military capital cases. *Id.* at 754, 116 S.Ct. at 1742. Abshier quotes from the oral argument in that case. We need not speculate about the meaning of questions asked by Supreme Court Justices at oral argument in the *Loving* case since we have the benefit of their final published opinions. All nine justices concurred in the judgment affirming Loving's death penalty. Loving had been convicted in a single trial of two separate murders and sentenced to death. One (under 10 U.S.C. § 918(1)) was premeditated murder, and one (under 10 U.S.C. § 918(4)) was felony murder. The underlying enumerated felony was robbery, which did not require an intent to kill nor an intent to injure. The only aggravator specified for the felony murder count was that Loving was the "actual perpetrator of the killing" or "triggerman." This aggravator, prescribed in a 1984 Executive Order by the President, was sufficient to save § 918(4) by genuinely narrowing the class of persons eligible for the death penalty. *Loving,* 116 S.Ct. at 1742; *citing Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). Like

*Loving,* Abshier's case involves an accused who did the killing himself.

¶ 151 In *Hopkins v. Reeves,* 524 U.S. 88, 118 S.Ct. 1895, 1902–03, 141 L.Ed.2d 76 (1998), the United States Supreme Court, by an 8–1 vote, affirmed the death penalty in a Nebraska case although neither the Nebraska felony murder statute nor the underlying felony, sexual assault, required proof of intent to kill or intent to injure.

¶ 152 In *Reeves,* the Supreme Court reversed the Eighth Circuit Court of Appeals which had misread *Tison* and *Enmund* as requiring a *mens rea* with respect to the killing, when the only intent required for a felony murder conviction was the intent to commit the underlying felony. The Supreme Court said:

> "[T]he Court of Appeals read *Tison* and *Enmund* as essentially requiring the States to alter their definitions of felony murder to include a *mens rea* requirement with respect to the killing. In *Cabana v. Bullock* (citations omitted), however, we rejected precisely such a reading and stated that 'our ruling in *Enmund* does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder that must be found by the jury ... and does not affect the state's definition of any substantive offense.'" *Reeves,* 524 U.S. at 99, 118 S.Ct. at 1902.

¶ 153 Ironically, the Supreme Court pointed out that the Nebraska capital felony-murder statute (under which they affirmed the death sentence) did not require proof of intent to kill, while instruction on non-capital Second Degree Murder had been properly rejected as a lesser included offense by Nebraska courts because it required proof of an additional element—intent to kill. *Id.*

¶ 154 Appellant's eighth proposition is denied.

## SUFFICIENCY OF EVIDENCE TO SUPPORT EACH AGGRAVATOR:

¶ 155 Appellant's Proposition Nine challenges the sufficiency of the evidence at trial to support the two aggravating circumstances found by the jury in this case: (1)

that the murder was "especially heinous, atrocious, or cruel," and that (2) "there exists a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

¶ 156 In *Powell v. State*, 906 P.2d 765, 1995 OK CR 37, ¶¶ 67, 71, Order Granting Rehearing, ¶ 3, 906 P.2d 765, 781, 782, 784, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996), we adopted by unanimous opinion the "standard of review" for sufficiency of the evidence to support aggravating circumstances in a death-penalty case established by the United States Supreme Court in *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). The Supreme Court held in *Jeffers* that the standard for federal habeas corpus review of a state court's finding of aggravating circumstances was the same as for the essential elements of the crime, that is, the "rational factfinder" standard established in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

¶ 157 The standard of review for sufficiency of evidence to support an aggravating circumstance is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Powell*, 906 P.2d 765, 1995 OK CR 37, Order Granting Rehearing, ¶ 3, 906 P.2d at 784. We had previously adopted the *Jackson v. Virginia* standard for appellate review of sufficiency of the evidence to establish essential elements of the crime. *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–204. We reaffirmed the *Powell* decision in two subsequent cases citing both *Powell* and *Jeffers: DeLozier v. State*, 1998 OK CR 76, ¶ 36, 991 P.2d 22, 29–30, and *Jackson v. State*, 1998 OK CR 39, ¶ 80, 964 P.2d 875, 894 (*Per Curiam*, with two judges concurring, and one judge concurring in result).

¶ 158 In order to sustain its burden of proof to establish that a murder was "especially heinous, atrocious, or cruel" the State must prove that the victim consciously suffered before death. *Smith v. State*, 1996 OK CR 50, ¶ 42, 932 P.2d 521, 535, *cert. denied*, 521 U.S. 1124, 117 S.Ct. 2522, 138

L.Ed.2d 1023 (1997). Dr. Stuemky testified that in his expert opinion, Ashley was conscious and crying during the beating she received from Abshier. He testified that one would expect a child to be conscious during most of the injuries because abuse usually starts because of the infant's crying and whining and once the child becomes unconscious and stops crying and whining, the abuse stops too. His testimony was corroborated by Appellant's story to Dr. Smith that Ashley sensed his rage and began whining and he hit her very hard. It is also corroborated by Stephanie's testimony about Abshier hitting Ashley and cussing at Ashley when she was crying in the car at Wal–Mart in October 1994.

¶ 159 Dr. Choi, the pathologist testified that there were many separate injuries before death but she could not tell whether Ashley was conscious when each of the blows was inflicted. Ashley vomited and then sucked it back into her lungs. She had received a blunt force injury to her chest that was severe enough to bruise her thymus which is protected behind the chest bone. The end of her tongue was bruised. She had nine (9) separate extensive subgaleal (beneath the scalp) hemorrhages, as well as the extensive subdural (inside the skull) hemorrhaging over both the right and left surface of the brain, and swelling of the brain which caused her death, as well as hemorrhaging inside the eye membrane which is consistent with violent shaking, or shaken-baby syndrome. In addition, the outer layer of her skin was ripped away from a large area of her face. Logic tells us that all of these wounds could not have been simultaneous.

¶ 160 Abshier claims, "The only evidence that the victim in this case was conscious [when she received the numerous blows to her head and body] came through the opinion testimony of Dr. Stuemky." Abshier, however, overlooks statements he himself made to Dr. Draper and to Dr. Smith. He told Dr. Draper that "he hit the child and knocked the child down and knocked the child to the ground," and that he "lost control." He told Dr. Smith that "because Ashley sensed his rage and began whining, he grabbed her by the hair and neck and slammed her down on

the floorboard" of the car. It is therefore obvious that she was conscious when at least two of those severe blows were inflicted upon her by Abshier, one in the car, and one outside. The evidence supports the jury finding beyond a reasonable doubt that Ashley was conscious and suffering in great pain during at least a significant part of the assault she received upon her body, before she lost consciousness and died.

¶ 161 The evidence likewise supports the jury finding beyond a reasonable doubt that "there exists a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The evidence in this case was that Appellant had abused his daughter many times before, including breaking her arm several months before he killed her. He avoided getting medical treatment for her arm. In 1994, Stephanie had seen Appellant hit Ashley in the car at Wal–Mart, Sherrie Casey had seen him once sling Ashley over the car seat by her arm, and on another occasion kick her to the ground in the yard. Ms. Casey also discovered many bruises on Ashley which had been hidden beneath her clothing. Curt Been of the Department of Human Services observed a knot on Ashley's forehead.

¶ 162 Appellant had assaulted Ashley many times on the day of her death. He did not take her to the hospital until she had been dead for several hours. He peeled the skin off of her face. As we said in *Workman v. State*, 1991 OK CR 125, ¶ 25, 824 P.2d 378, 383–384, *cert. denied*, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992), this Court has consistently held that the calloused manner in which a crime is committed may support a finding of a continuing threat. *Fisher v. State*, 1987 OK CR 85 736 P.2d 1003, 1009; *Robison v. State*, 1984 OK CR 21, ¶ 37, 677 P.2d 1080, 1088, *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). Appellant's continuing pattern of brutality and violence against a helpless child supports the jury finding, beyond a reasonable doubt, that "there exists a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

¶ 163 Appellant's Proposition Nine is without merit.

## CLAIMS THAT AGGRAVATORS ARE UNCONSTITUTIONAL

¶ 164 Appellant in his Proposition Ten claims that the "especially heinous, atrocious or cruel" aggravating circumstance, and the "continuing threat to society" aggravating circumstance are unconstitutionally vague. In the case of *Wood v. State*, 1998 OK CR 19, ¶ 57, 959 P.2d 1, at 15, we held:

"This Court has repeatedly rejected arguments on the unconstitutionality of the 'continuing threat' aggravating circumstance and we are not persuaded to alter our prior position. *See Cooper v. State*, 889 P.2d 293, 315 (Okl.Cr.1995); *Malone v. State*, 876 P.2d 707, 715–16 (Okl.Cr.1994), and cases cited therein; *Walker v. State*, 887 P.2d 301, 320 (Okl.Cr.1994), cert. denied, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995)."

¶ 165 We held in *Workman*, 1991 OK CR 125, ¶¶ 24–25, 824 P.2d at 383:

"Appellant also asserts that the other aggravating circumstance found by the jury, that 'there exists a probability the defendant would commit criminal act[s] of violence that would constitute a continuing threat to society,' is both unconstitutionally vague and unsupported by the evidence. . . . This Court has repeatedly upheld the validity of this particular circumstance. *Rojem v. State*, 753 P.2d 359, 369 (Okl.Cr.1988) [cert. denied, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988) ]. See also *Barefoot v. Estelle*, 463 U.S. 880, 896–97, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090, 1106 (1983) and *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)."

See also *Cannon v. State*, 1995 OK CR 45, ¶ 42 & n. 53, 904 P.2d 89, 105 & n. 53, *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996) (holding that the "continuing threat" aggravating circumstance is specific and not vague), *citing Malone v. State*, 1994 OK CR 43, 876 P.2d 707, 717; *Mitchell v. State*, 1994 OK CR 70, 884 P.2d 1186, 1208, *cert. denied*, 516 U.S. 827, 116

S.Ct. 95, 133 L.Ed.2d 50 (1995); *Hogan v. State*, 1994 OK CR 41, 877 P.2d 1157, 1162, *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995); *Snow v. State*, 1994 OK CR 39, 876 P.2d 291, 298; *Revilla v. State*, 1994 OK CR 24, 877 P.2d 1143, 1153, *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); *Ellis v. State*, 1992 OK CR 45, 867 P.2d 1289, 1301, cert. denied, 513 U.S. 863, 115 S.Ct. 178, 130 L.Ed.2d 113 (1994); *Trice v. State*, 1993 OK CR 19, 853 P.2d 203, 220–221, *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

¶ 166 We also held in the *Cannon* case that the aggravating circumstance "especially heinous, atrocious, and cruel" as limited by this Court is not unconstitutional for vagueness. *Cannon*, 1995 OK CR 45, ¶ 43 & n. 54, 904 P.2d 89, 105 & n. 54, *citing Stouffer v. State*, 1987 OK CR 166, 742 P.2d 562 (Opinion on Rehearing), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Clayton v. State*, 1992 OK CR 60, 840 P.2d 18, 30, *cert. denied*, 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *Stafford v. State*, 1992 OK CR 33, 832 P.2d 20; *Rojem v. State*, 1988 OK CR 57, 753 P.2d 359, *cert. denied*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988); *United States v. Kelly*, 1 F.3d 1137, 1143 (10th Cir.1993); *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

¶ 167 Accordingly, this tenth proposition is denied.

## MEANING OF "LIFE WITHOUT PAROLE"

¶ 168 Appellant in Proposition Eleven recognizes that this Court has consistently rejected the argument that jurors should be instructed on the meaning of the life without possibility of parole sentencing option, but asks this Court to revisit this issue. We decline to do so. *See, e.g., Mollett v. State*, 1997 OK CR 28, ¶ 41, 939 P.2d 1, 11, *cert. denied*, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998); *McCracken v. State*, 1994 OK CR 68, 887 P.2d 323, 334, *cert. denied*, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995).

¶ 169 The United States Supreme Court has recognized that where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible. *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). The trial court instructions meet the requirement of *Simmons* by telling the jury, where a Bill of Particulars requesting the death penalty has been filed, that the possible punishments they may impose for First Degree Murder are "Imprisonment for Life," "Imprisonment for Life without Parole," or "Death." As we have said repeatedly, the concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further. *Mollett*, 1997 OK CR 28, ¶ 41, 939 P.2d at 11.

¶ 170 Appellant's Eleventh Proposition is denied.

## RELEVANCE OF CERTAIN OPINIONS AND EXHIBITS

¶ 171 Appellant in Proposition Twelve complains on appeal that several witnesses testified and many exhibits were admitted at trial that he deems irrelevant. He complains that his neighbor Nancy Connelly was called as a witness. He did not object at trial, and has therefore waived all but plain error. Connelly saw Abshier come out of his house alone around 2:00 p.m. on March 30, 1994, which would be around the time of Ashley's death. She did not see Ashley. He put something like a blanket in his car trunk. When Appellant saw Connelly, he got in his car hurriedly, and left squealing his tires. Connelly is the only witness at trial who fixed Abshier's whereabouts between about 1:00 p.m. and 5:00 p.m.

¶ 172 Ashley's body was wrapped in a blanket at 5:00 p.m. when Appellant took her to Hardee's and the hospital. The police found Ashley's Teddy bear in the trunk of the car after Appellant's arrest. The rag from his kitchen, which Appellant implied in his statement to Dr. Smith would have Drano and Ashley's facial skin on it, was never found. A crime scene photograph admitted in evidence shows a bottle of liquid Drano sitting

on the television near the front door in Abshier's house.

¶ 173 We find no error, and no plain error, in the admission of this highly relevant and probative evidence of Appellant's actions near the time of the crime.

¶ 174 Appellant objects generally to the photographs of his house and his car. We do not know where Ashley's murder took place. Appellant told several stories about what happened to Ashley. He claimed that she was hit in the park by a black LTD driven by a black man. He claimed to Dr. Wanda Draper that he "hit the child and knocked the child down and knocked the child to the ground." He told Dr. Smith that he knocked her into the front floorboard of his car, and she didn't move. He said he carried her into his house and wiped her face so hard with a wet rag that her skin came off. That skin was never found.

¶ 175 Appellant objects to evidence, for example, showing a finding of blood in his car. He states, "Though the admission of any one piece of evidence here may have been harmless, the cumulative effect of this irrelevant and (as to some) prejudicial evidence could only be to skew the fact-finding process and to render Mr. Abshier's trial fundamentally unfair." Appellant fails to articulate how this evidence prejudiced his right to a fair trial. The State was entitled to show that law enforcement made a diligent and extensive search for evidence during their investigation. This twelfth proposition is denied.

## DR. WAUTERS' OPINION–TAPE USED ON VICTIM'S FACE

¶ 176 Appellant objects in his thirteenth proposition to Dr. Wauter's opinion about what caused the skin to be peeled off of Ashley's face. Appellant's theory is that Dr. Wauter needs to be qualified as a scientific expert under the guidelines of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 2793, 125 L.Ed.2d 469 (1993), and *Taylor v. State*, 1995 OK CR 10, ¶ 15, 889 P.2d 319, 327. This argument is not well taken because the test set out in *Daubert* and *Taylor* pertains to introduction of expert testimony as it relates to new or novel expert evidence. Dr. Wauter is Board Certified in Emergency Medicine with many years experience. He is qualified to give a medical opinion about the cause of a plainly visible external trauma to Ashley's face, the type of opinion he must form on a daily basis in his specialty. His lack of experience with a specific facial trauma would go to the weight to be given the evidence, not its admissibility. We held in *Revilla v. State*, 1994 OK CR 24, ¶¶ 19–20, 877 P.2d 1143, 1150, that an emergency room physician was properly allowed to testify that injuries to a child were caused by "non-accidental trauma" based upon the information he received from third parties and his observations of the injuries on the decedent's body. This was not novel expert testimony but long accepted medical testimony. As we said in *Romano v. State*, 1995 OK CR 74, ¶ 33, 909 P.2d 92, 112, *cert. denied* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996), we do not apply the *Daubert* analysis retroactively to previously accepted, valid, expert testimony.

¶ 177 This Court has long held that the qualification of a person to testify as an expert is a matter which rests within the sound discretion of the trial court, and that decision will not be disturbed on appeal absent an abuse of that discretion. *Clayton v. State*, 1992 OK CR 60, ¶ 37, 840 P.2d 18, 28, *cert. denied*, 507 U.S. 1008, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993); *Taylor v. State*, 1995 OK CR 10, ¶ 43 n. 85, 889 P.2d 319, 338 n. 85.

¶ 178 There were several theories discussed at trial: (1) Appellant stomped on the back of Ashley's head and the abrasion against the floor or carpet caused the skin on her face to peel off. This was Dr. Choi's theory. (2) Appellant put tape on Ashley's face and then pulled it off quickly. (3) Appellant told Dr. Smith, he picked up a rag at the kitchen sink, that it was near a can of Drano, that he realized Ashley was probably dead, that he ran some water on the rag and rubbed it across her face harshly, and that the skin of her face just came off. It is not clear why he mentioned the Drano unless he is implying that Drano may have been on the rag. A plastic bottle of liquid Drano was found in the living room.

¶ 179 Defense counsel elicited testimony on cross-examination of Detective Nelson, who saw Ashley's body at the hospital, that it could have been a liquid type burn, a friction burn, "or we even considered maybe something being placed on the face and ripped off, like tape." Thus there were three witnesses who personally examined Ashley's denuded face and said it may have been caused by tape. Counsel asked him, "And you had seen injuries similar to this which were burns, correct?" The Detective answered, "I've seen liquid burns that were similar to this."

■ ¶ 180 Although defense counsel did not establish that Nelson was an expert in this area, there were no objections, and Appellant has not complained that his testimony was improper. We said in *Revilla*, "Further, the very testimony to which [Revilla] now complains was the result of the re-cross-examination of the doctor by defense counsel. It is well established that a party may not complain of error which he himself invited." *Revilla*, 1994 OK CR 24, ¶ 20, 877 P.2d at 1150. Since Appellant elicited testimony about the same tape theory from Nelson that Dr. Wauter had testified about, any error in admitting Dr. Wauter's opinion would be harmless, at most.

■ ¶ 181 Of the three theories, the tape theory is no more prejudicial to the Appellant, than his own story, that he harshly wiped her face with a rag, implying that the rag had Drano on it, and that her skin just came off, or that it was a "liquid burn." Also, the tape theory is no more prejudicial than Dr. Choi's theory that the denuding of the skin from Ashley's face was caused by being stomped in the back of her head, rubbing her face against a rough surface such as cement or carpet. In all, there were nine (9) sub-galeal, or beneath-the-scalp, bruises indicating nine separate blows to the head. One of these was a patterned bruise on the back of Ashley's head which could have been caused by a shoe tread.

¶ 182 The missing facial skin was not found in a search of Appellant's house or car. Dr. Choi, when asked if Dr. Wauter's tape theory was possible, testified, "Anything is possible." Choi testified that she did a microscopic examination of the denuded area on the face and found no foreign particles. Defense counsel asked her if she had examined bodies where the victim's hands had been bound with tape. She explained that where tape has been applied to a body, there is usually some "paste material still remaining." However, her word "usually" does not mean always, and therefore does not preclude Dr. Wauter's theory. Further, Dr. Wauter stated it was just his opinion, and deferred to the opinion of Dr. Choi. Since Appellant claimed that he ran some water on a rag and rubbed it across her face harshly, and that her skin came off on the rag, his action could have washed away or removed any foreign particles such as grit, carpet fibers, tape residue, or Drano that may have been evidence of the source of her injury.

¶ 183 Officer Terry Harrison of the Fatality Accident Investigation Squad, who had been an accident investigator for over 20 years and had investigated over 5,000 accidents, and was highly qualified by training, said the injuries were not consistent with an automobile-pedestrian type accident. He also testified as to the denuded facial area and said there were no deep cuts. He said it was just like something took a piece of skin and tore it off. "It's level all the way across. It also is in the eyelids, the lips. It's on the inside of the nose here, both sides. So whatever made this injury was in contact with it and the only way it can do that is to put something that forms around the nose—" He further testified that if the child had been dragged by a car in contact with the roadway, there would be abrasions on other parts of her body, not just her face-especially "the knees and elbows."

¶ 184 Harrison demonstrated with a Styrofoam head that if the nose is in contact with the roadway, "at no time do the eyeballs or the eyelids get in contact with the roadway," unless the nose were ground down by abrasion. The bone above the eye socket, where the eyebrow is located, protects the eye and eyelid from injury. The photographic exhibits clearly show that the red denuded area covers entirely her left eyelid, but neither eyebrow. Thus, Officer Harrison's testimony completely discredits Abshier's first story about a car hitting Ashley in the park. No

one asked Harrison for a theory about what happened to her face, and he did not volunteer one. His comments seem to contradict Dr. Choi's theory, however, as skin was missing from the left eyelid and not from the area of the eyebrows above the eye. His testimony would make the existence of the tape or liquid burn theories more likely.

¶ 185 Thus, the experts disagreed as to what caused a layer of skin to be removed from a large area of Ashley's face, and the exact mechanism of the injury remains a mystery. The exact cause of this injury is not essential to the resolution of Appellant's appeal, however. The cause of death, as testified to by Dr. Choi, was shaken baby syndrome. We do know that the injury to Ashley's face was caused by Abshier, as he stated to Dr. Wauter at the hospital, and later to Drs. Smith and Draper that he was alone with her all afternoon and that the skin came off while he was rubbing her face harshly with a rag, and other witnesses testified that her face was not injured when she was last seen alive with him around noon.

¶ 186 Appellant was seen coming out of his house alone at 2:00 p.m. on the day of the crime, putting something like a blanket in the trunk of his car, and driving off in a hurry. He was not seen again until 5:00 p.m., when he was sitting in front of Hardee's with Ashley's body wrapped in a blanket, and she had been dead for several hours. The trial court's admission of the doctor's testimony was not error, and furthermore, Appellant was not prejudiced by the testimony. Appellant's Proposition Thirteen is denied.

**INSTRUCTION: UNREASONABLE FORCE IS "MORE THAN THAT AMOUNT ORDINARILY USED AS A MEANS OF DISCIPLINE."**

¶ 187 Appellant in Proposition Fifteen complains for the first time on appeal about Instruction No. 4–39–OUJI–CR (2d) defining unreasonable force as *"more than that ordinarily used as a means of discipline."* (Emphasis added.) The definition is derived from 21 O.S.1991, § 844. Appellant admits he made no objection to this instruction at trial. Therefore, we will review for plain error only. Appellant makes the strange statement: "The instruction in Appellant's case went even further, allowing a conviction for use of force that was reasonable but not ordinarily used to discipline a child." Appellant omits two key words: "more than." If the force used on a child is *more than* that ordinarily used as a means of discipline, it would be unreasonable. Further, the degree of force proven in Abshier's case could not be construed as reasonable under any standard. We find no plain error in the instruction and find no error under Proposition Fifteen.

**VAGUENESS OF CHILD MURDER STATUTE–CONSTITUTIONALITY**

¶ 188 Appellant in his sixteenth proposition asks us to declare the First Degree Murder of a Child statute, 21 O.S.Supp.1999, § 701.7(C), unconstitutional and void for vagueness. Appellant is aware that this Court rejected that argument in *Drew v. State*, 1989 OK CR 1, 771 P.2d 224, 228, but asks us to revisit the issue, which we decline to do. Proposition Sixteen is denied.

**MANDATORY SENTENCE REVIEW**

¶ 189 In Proposition Seventeen, Appellant asks this Court to find that the verdict of death was influenced by passion, prejudice, and other arbitrary factors. This Court is charged by the Legislature to determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance enumerated in 21 O.S.1991 § 701.12.

¶ 190 Appellant asks us to consider under this proposition the arguments he made in his Propositions Three, Five, Six, Eight, and Nine. As we have examined each of those propositions herein and found each should be denied, we do not find that the matters complained of in those propositions caused the jury to impose the sentence of death under the influence of passion, prejudice, or any other arbitrary factor.

¶ 191 In addition, Appellant alleges that the State engaged in egregious

conduct in the second stage closing arguments. We have considered each of the instances of alleged prosecutorial comments on the evidence and we find that they were fair and proper comments on the testimony and exhibits which had been properly admitted into evidence. In closing argument, counsel for each side is entitled to make comments based on the evidence. There was no error here.

¶ 192 Appellant further alleges that the prosecutor made highly improper comments on the punishment in the case by saying Life without Parole would mean, "He gets to sleep on clean sheets, eat three meals a day. He gets visits from his relatives, watch TV, works out. Is that adequate punishment for torturing and killing a child?" There was no contemporaneous objection to this comment. It was in response to defense counsel's statements that the jury should give Appellant the most extreme punishment he can receive, Life without Parole. Defense Counsel also said that Appellant's punishment ends with his death, but then the punishment would begin for his mother and not end until she dies. Counsel had further argued: "[Appellant has] lost his right to enjoy the everyday things that we will be doing after we finish this trial. He's lost the right to choose what kind of meal he wants. He's lost the right to visit with family. He's lost the right to ever have romance with anyone again."

¶ 193 The statement of the prosecutor was not plain error, and it was invited by the argument of opposing counsel. Although we criticized comments containing similar language in *Duckett v. State*, 1995 OK CR 61, ¶ 46, 919 P.2d 7, 19, those comments contained the additional words, "while [the victim] lies cold in his grave.... How do [his relatives] go visit him?" and the comment in *Duckett* was not invited. Therefore relief based on this argument is denied.

¶ 194 We are satisfied that neither passion, prejudice, nor any other arbitrary factor is present in the record to undermine our confidence in the jury's verdict. As we found under Appellant's ninth proposition herein, ample evidence supports the jury's finding of the two aggravating circumstances:

(1) that Appellant was a continuing threat to society, and (2) that the murder was especially heinous, atrocious or cruel.

¶ 195 The trial court gave an instruction that evidence had been introduced at trial as to the following mitigating circumstances, and it was for the jury to resolve what circumstances were mitigating under the facts and circumstances of the case:

> "(1) The defendant has no history of violence prior to the abuse of Ashley Abshier;
>
> "(2) The defendant has had a severe problem with alcohol abuse in the past.
>
> "(3) The defendant was under the influence of methamphetamine at the time he committed the murder.
>
> "(4) The defendant's mother, Celia Johnson, loves and cares for him and will provide emotional and financial support.
>
> "(5) The defendant has suffered from depression, mood swings, and anxiety attacks throughout his life.
>
> "(6) The defendant has shown remorse over the death of his daughter.
>
> "(7) The defendant has suffered a learning disability starting at an early age."

In addition, the jurors were advised that they could decide that other mitigating circumstances exist, and if so, they should consider those circumstances as well.

¶ 196 We find in Proposition Seventeen, that either one or both of the enumerated aggravating circumstances found by the jury would be sufficient to support a jury finding that the aggravating circumstances outweigh the mitigating circumstances in this case, and we find the evidence at trial supported the jury finding that both aggravators were proven beyond a reasonable doubt.

## FAIR TRIAL–ACCUMULATION OF ERRORS

¶ 197 Abshier claims that the accumulation of errors deprived him of a fair trial. Finding only one error in Propositions One through Seventeen (admission of certain victim impact evidence discussed in Proposition Five), which was not preserved for appellate review and was not plain error, there could

be no accumulation of errors. Proposition Eighteen is denied.

## DECISION

¶ 198 Steven Lynn Abshier's Judgement and Sentence of Death for First Degree Murder of a Child is hereby **AFFIRMED.**

LUMPKIN, P.J., and JOHNSON, V.P.J., CONCURS.

CHAPEL, J., DISSENTS.

STRUBHAR, J., CONCURS IN RESULTS.

CHAPEL, J., DISSENTING:

¶ 1 Errors in first and second stage deprived Abshier of a fair trial and reliable sentencing procedure. Initially I must note my continued dissent to this Court's erroneous interpretation of the child abuse murder statute. I disagree both with the conclusion that child abuse murder is a general intent crime,[1] and with the consequent imposition of the death sentence for a general intent crime without a finding that Abshier was personally culpable for his daughter's murder.[2]

¶ 2 I disagree with the majority's resolution of Proposition II. Although prospective juror Copeland said he could hear the evidence with an open mind and consider all three punishments, he also stated he could not consider anything less than death for a defendant convicted of child abuse murder who relied on drugs or alcohol as an excuse. The trial court denied Abshier's request to excuse Copeland for cause. Under the special circumstances of this voir dire examination this was error.[3] Usually we find that this type of statement is cured when a prospective juror later says he can consider all three punishments, because his expressed preference for the death penalty in a particular situation is theoretical-he doesn't know what the evidence will be. That is not the case here. Counsel had already said Abshier was guilty of child abuse murder and suggested his drug abuse would be offered in mitigation. Copeland said under those circumstances he would impose the death penalty. Any suggestion that he would consider any other evidence that might (but would not) be presented was meaningless. I disagree with the majority's mistaken conclusion that this issue was not preserved for review. Abshier asked Copeland be removed for cause, used a peremptory challenge to remove him, and made a record of the sitting juror he would have removed with that peremptory challenge. That is all that is required.[4]

¶ 3 Turning to errors in the second stage, I would grant Proposition XI. I once again note my opinion that jurors should be in-

1. The majority appears to misunderstand the import of this conclusion. In discussing Proposition IV the majority suggests that other crimes evidence was relevant to prove Abshier's intent, although no specific intent to injure is required for the general intent crime of child abuse murder, because the State was required to prove Abshier acted willfully or maliciously. *Fairchild* went to great lengths to hold that neither of these terms requires proof of any specific intent, and the other crimes evidence admitted here could not have been relevant for that purpose. The majority also suggests that intent to kill, while not an element for guilt, would be relevant evidence in mitigation (op. at 596). I fail to see how lack of intent to kill can be relevant in mitigation if no intent was required to commit the crime and no *Enmund/Tison* evaluation is necessary (as the majority holds).

2. *Gilson v. State*, 2000 OK CR 14, 8 P.3d 883, 931, 932 n. 13 (Chapel, J., dissenting); *Malicoat v. State*, 2000 OK CR 1, 992 P.2d 383, 395 n. 14,

398 n. 23, *cert. denied*, 531 U.S. 888, 121 S.Ct. 208, 148 L.Ed.2d 146 (Oct. 2, 2000); *Fairchild v. State*, 1999 OK CR 49, 998 P.2d 611, 637 (Chapel, J., dissenting). Although this Court has previously held in *Fairchild, Gilson,* and *Malicoat* that *Ennund/Tison* findings are not required, the majority apparently worries that those statements are insufficient, as the opinion repeats almost verbatim the flawed analysis used to justify this conclusion in *Fairchild*.

3. *Humphreys v. State*, 1997 OK CR 59, 947 P.2d 565, 570–71.

4. *Cannon v. State*, 1995 OK CR 45, 904 P.2d 89, 98, *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996); *Ross v. State*, 1986 OK CR 49, 717 P.2d 117, 120, *aff'd, Ross v. Oklahoma*, 487 U.S. 81, 89–90, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988); *cf. Malicoat*, 992 P.2d at 393 (issue preserved where defendant removed five challenged jurors with peremptories but could not remove sixth).

formed of the meaning of life without parole.[5] I also conclude there is insufficient evidence to support either aggravating circumstance. The allegation that Abshier presents a continuing threat to society is supported by the manner in which the crime was committed, plus unadjudicated instances of prior abuse to this victim. I have previously disagreed with the use of these factors to support this aggravating circumstance.[6] In order to support the claim that the murder was especially heinous, atrocious or cruel, the State must show conscious suffering from torture or serious physical abuse.[7] The victim's body showed she had suffered horrific injuries, but the medical examiner could not confirm whether the child was conscious when they were inflicted. Abshier himself said only that he hit the victim and lost control, and that when the victim began whining he hit her. The State relied on opinion evidence from its child abuse expert, Dr. Stuemky, who stated he thought the victim was proba-

bly conscious because most child abuse continues until a child loses consciousness, then stops when the child stops crying. This evidence does not support the majority's conclusion that the victim was conscious for at least two of the blows. We have rejected this aggravating circumstance where there was no direct or circumstantial evidence of conscious suffering.[8] I would similarly reject it here. I note briefly my disagreement with the majority's treatment of the egregious improper comments by the prosecutors in closing argument.[9]

¶ 4 Finally, I cannot agree with the majority that Abshier received effective assistance of counsel in this case. The lawyer for a person charged with a crime, at a minimum, must serve as an advocate for his client and hold the prosecution to its burden of proof. Defense counsel cannot abdicate that responsibility and concede guilt-at least not without the client's consent-and provide effective assistance to his client.[10] I fully agree with the

---

5. *Malicoat,* 992 P.2d at 400, n. 43, and cases cited therein.

6. *See, e.g., Gilson,* 8 P.3d at 931, n. 3 (Chapel, J., dissenting); *Hooper v. State,* 1997 OK CR 64, 947 P.2d 1090, 1108 n. 58, *cert. denied,* 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998); *Cannon,* 904 P.2d at 106, n. 60.

7. *Malicoat,* 992 P.2d at 398.

8. *See, e.g., Turrentine v. State,* 1998 OK CR 33, 965 P.2d 955, 976–77, *cert. denied,* 525 U.S. 1057, 119 S.Ct. 624, 142 L.Ed.2d 562; *Cheney v. State,* 1995 OK CR 72, 909 P.2d 74, 81; *Perry v. State,* 1995 OK CR 20, 893 P.2d 521, 533–34; *Hayes v. State,* 1992 OK CR 16, 845 P.2d 890, 892; *Battenfield v. State,* 1991 OK CR 82, 816 P.2d 555, 565, *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992); *Brown v. State,* 1988 OK CR 59, 753 P.2d 908, 913. *See also Washington v. State,* 1999 OK CR 22, 989 P.2d 960, 975 (investigating officer's opinion of events at crime scene, based on physical evidence, barely supported State's theory of conscious suffering, but Court warned that evidence was not strong given lack of medical evidence and brief duration of crime).

9. This Court has repeatedly condemned the "three hots and a cot" argument, only to be ignored. *Hooks v. State,* 2001 OK CR 1, ¶ 52, 19 P.3d 294 (see Note 55 and cases cited therein); *Washington,* 989 P.2d at 979.

10. The Tenth Circuit has held that "an attorney who adopts and acts upon a belief that his client should be convicted 'fail[s] to function in any

meaningful sense as the governments adversary.'" *Osborn v. Shillinger,* 861 F.2d 612, 625 (10th Cir.1988)(quoting *U.S. v. Cronic,* 466 U.S. 648, 666, 104 S.Ct. 2039, 2051, 80 L.Ed.2d 657 (1984)). *Accord, Francis v. Spraggins,* 720 F.2d 1190, 1194 (11th Cir.1983), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985)("Where a capital defendant, by his testimony as well as his plea, seeks a verdict of not guilty, counsel, though faced with strong evidence against his client, may not concede the issue of guilt merely to avoid a somewhat hypocritical presentation during the sentencing phase and thereby maintain his credibility before the jury."); *Wiley v. Sowders,* 647 F.2d 642, 650 (6th Cir.), *cert. denied,* 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981)(counsel's complete concession of the defendant's guilt nullifies the defendant's right to have the issue of guilt or innocence presented to the jury as an adversarial issue and therefore constitutes ineffective assistance of counsel); *Ramirez v. U.S.,* 17 F.Supp.2d 63 (D.R.I.1998)(counsel's acknowledgment that the defendant was guilty of all charges held so egregious, and so undermined the adversarial process and confidence in the justness of the result, that prejudice was presumed); *People v. Hattery,* 109 Ill.2d 449, 94 Ill.Dec. 514, 488 N.E.2d 513, 519 (1985), *cert. denied,* 478 U.S. 1013, 106 S.Ct. 3314, 92 L.Ed.2d 727 (1986)(counsel's strategy of conceding guilt in order to concentrate efforts at avoiding death penalty was "totally at odds with defendant's earlier plea of not guilty" and although strategy may have been a reasonable one in light of the overwhelming evidence of client's guilt, it was an impermissible one); *State v. Harbison,* 337

majority that in some cases there is simply no defense to be offered in the first stage, and that defense attorneys need to maintain enough credibility to effectively fight for a sentence less than death in the punishment phase of trial. However, I see a clear distinction between: (a) holding the state to its burden of proof by requiring it to put on evidence in support of each element of the crime charged and engaging in an adversarial testing of that evidence, while electing not to affirmatively present a defense;[11] and (b) telling the jury outright that the defendant is guilty of the crime charged, as Abshier's defense attorney did throughout, from *voir dire* to the close of the first stage.[12]

¶ 5 The majority claims that the State still had to call its witnesses and prove up every element of the crime charged. However, where there is an outright concession of guilt, the jury is left with no reason or motivation to weigh the state's evidence or decide how much credibility to afford each witness's testimony. Accordingly, the presentation of the state's case becomes nothing more than a rote exercise; the result—a guilty verdict—is a foregone conclusion due to defense counsel's concession of guilt.

¶ 6 The majority is wrong in suggesting we have condoned a similar failure of representation. In *Wood v. State*[13] we held counsel did not concede guilt during first stage closing argument by telling jurors they would have a reasonable doubt if they did not understand or believe the DNA evidence or witnesses, but would not have a reasonable doubt if they believed the State's evidence. In *Hale v. State*[14] we found counsel did not concede guilt during first stage closing argument by saying there was no doubt the defendant was involved in the crime but asking jurors to consider the extent to which Hale was involved. *Trice v. State*[15] involved a capital post-conviction claim of ineffective assistance of appellate counsel. We held appellate counsel was not ineffective for failing to raise trial counsel's lack of effectiveness in conceding Trice's guilt as to rape (but not murder) where Trice confessed to the rape and the defense strategy focused on his lack of specific intent to commit murder. In none of these cases did trial counsel flatly tell prospective jurors, before trial even began, that his client was guilty.

¶ 7 The majority's discussion of cases from other jurisdictions suffers from similar omissions. In *Gomes* the First Circuit held counsel reasonably conceded guilt *as to one drug transaction,* which was relatively minor and supported by overwhelming evidence, in order to argue his client was innocent of the remaining three charges.[16] In *Lucas,* counsel conceded during first stage closing that his client was at the scene and probably committed the homicides, but argued he was too intoxicated to form the specific intent necessary for murder.[17] *Lucas* relied on

---

S.E.2d 504, 507–08 (N.C.1985), *cert. denied.* 476 U.S. 1123, 106 S.Ct. 1992, 90 L.Ed.2d 672 (1986)(concluding per se ineffective assistance of counsel is established in every case where a defendant's counsel admits the defendant's guilt to the jury without the defendant's consent); *State v. Wiplinger,* 343 N.W.2d 858, 861 (Minn. 1984)(even if defense counsel only *impliedly* concedes guilt without client's consent, error requires reversal "even if it can be said that the defendant would have been convicted in any event.").

**11.** *See e.g., Malicoat,* 992 P.2d at 405–406 (defense counsel not ineffective for sound strategic decision to refrain from presenting a defense in first stage).

**12.** In a case with facts almost identical to these, the Supreme Court of Illinois found counsel's unequivocal concession of guilt in order to focus on avoiding the death penalty failed to subject the state's case to the "meaningful adversarial testing" required by the Sixth Amendment, and

defendant's murder convictions were reversed. *Hattery,* 94 Ill.Dec. 514, 488 N.E.2d at 519.

**13.** *Wood v. State,* 1998 OK CR 19, 959 P.2d 1, 15–16.

**14.** *Hale v. State,* 1988 OK CR 24, 750 P.2d 130, 142, *cert. denied,* 488 U.S. 878, 109 S.Ct. 195, 102 L.Ed.2d 164.

**15.** *Trice v. State,* 1996 OK CR 10, 912 P.2d 349, 355. This post-conviction case was decided before the sweeping amendments to the capital post-conviction statute.

**16.** *United States v. Gomes,* 177 F.3d 76, 83 (1st.Cir.1999).

**17.** *People v. Lucas,* 12 Cal.4th 415, 48 Cal. Rptr.2d 525, 907 P.2d 373, 392 (Cal.1995), *cert. denied,* 519 U.S. 838, 117 S.Ct. 114, 136 L.Ed.2d 66 (1996).

*Cain,* where the California Supreme Court held counsel was not ineffective, in a felony-murder case, for conceding that the evidence showed his client was guilty of the underlying felony and thus of felony murder under the law, but was not eligible for the death penalty.[18] The California Court found that counsel had good strategic reasons for this argument and there was no indication that the defendant disagreed with it. As I discuss below, Abshier testified he was surprised and shocked to hear counsel concede his guilt. In *Brown* the Fourth Circuit correctly noted that counsel who admits, in second stage argument, the crimes of which the defendant was convicted in first stage, is not conceding guilt.[19] The Court specifically "[did] not recommend [counsel's] arguments as a model" but found counsel was not ineffective for admitting the State's evidence supported the aggravating circumstances, before arguing his case in mitigation.[20] In *Kitchens* the Fifth Circuit found counsel did not concede guilt where counsel admitted the defendant committed homicide but argued the circumstances of the crime did not equal capital murder.[21]

¶ 8 We remanded this case for the District Court to determine (a) whether Abshier knew of and consented to counsel's decision to concede guilt in his case; (b) whether trial counsel was ineffective in second stage closing argument; and (c) whether trial counsel was ineffective by failing to investigate and call witnesses in mitigation. After independent review of the evidentiary hearing transcript, I must respectfully disagree with both the majority and the trial court. First, I cannot find Abshier knew of or consented to counsel's decision to concede guilt. The majority admits that Abshier stated he did not

know counsel was going to concede his guilt in voir dire and was "shocked" to hear counsel do so. Counsel testified he could not remember advising Abshier of this decision and would not be surprised if he didn't, since at that point in the trial he was so angry with Abshier he had not spoken to him and felt his input would not be useful. The majority dismisses this evidence by suggesting that Abshier cannot be believed since he is under sentence of death, and trial counsel is merely trying to save his client's life. Finally, the majority relies heavily on the fact that, after hearing counsel concede his guilt to the jury, Abshier never told anyone he disapproved of that action. Astonishingly the majority concludes that Abshier agreed to counsel's decision to concede guilt because "he made no effort at any time during the trial to express to the judge his disagreement" after the fact. Understandably, the majority cites no case for this novel conclusion that we will presume waiver from a silent record. In the absence of any expression of consent, and given the testimony at the evidentiary hearing, I must conclude that Abshier neither knew about nor consented to counsel's action conceding his guilt before trial even began.

¶ 9 To make matters worse, counsel's performance did not improve in second stage. The majority opinion adopts the District Court finding that counsel's egregious closing remarks were made in an effort to be candid and establish a rapport with the jury. In closing argument, counsel stated "you are not going to consider a life sentence and you shouldn't"; referred to Abshier's mitigation evidence as "excuses"; commented on Abshier's right to remain silent by saying, "He couldn't even take the stand to tell you he did it";[22] referred to Abshier's initial lies about

---

18. *People v. Cain,* 10 Cal.4th 1, 40 Cal.Rptr.2d 481, 892 P.2d 1224, 1241–42 (1995), *cert. denied,* 516 U.S. 1077, 116 S.Ct. 783, 133 L.Ed.2d 734.

19. *Brown v. Dixon,* 891 F.2d 490, 500 (4 Cir. 1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990).

20. *Brown,* 891 F.2d at 501. *See also Carter v. Johnson,* 131 F.3d 452 (5th Cir.1997), also cited by the majority, where during the penalty phase counsel stated the jury would be justified in imposing the death penalty, before pleading for

mercy and urging the jury to return a life sentence.

21. *Kitchens v. Johnson,* 190 F.3d 698, 704 (5 Cir.1999). The Texas capital sentencing scheme requires a jury to determine at the close of the guilt phase whether the defendant has committed a capital crime before moving to a capital penalty phase.

22. I cannot agree that this is a laudable attempt to tell the jury Abshier took responsibility for his actions.

how the victim died; told the jury that the victim did not have a chance from the time she was born; admitted Abshier was a continuing threat unless incarcerated and suggested the jury would decide the murder was especially heinous, atrocious or cruel; and said the jury should give Abshier the harshest penalty possible, which in counsel's opinion was life without parole rather than death. Predictably, this argument backfired. I cannot find defense counsel's closing argument marshaled the evidence for his side before submission of the case to judgment.[23] Further, I cannot characterize as effective a technique which establishes a rapport with the jury by maligning one's client and disparaging his mitigating evidence.

¶ 10 Defense counsel did call relatives and some experts to testify to Abshier's family history and drug and alcohol addictions. At the evidentiary hearing on remand Abshier presented three family members he claims trial counsel should have found and called. All three would have testified that they knew Abshier as a happy, peaceful man who was good with children and not violent. Given the resounding evidence of counsel's ineffectiveness above, I do not determine whether counsel was ineffective for failing to find these witnesses, beyond noting that their testimony would certainly have been relevant had they been called. However, I take strong exception to the majority's comment that Abshier did not provide an affidavit stating he advised counsel of "the existence or names of these potential witnesses." When applying for an evidentiary hearing on the issue of ineffective assistance of trial counsel, appellate counsel must provide this Court with affidavits showing the strong possibility that trial counsel was ineffective by clear and convincing evidence.[24] This is a stringent standard. This Court has never required a defendant to waive attorney-client privilege and reveal communications with trial counsel in affidavit form when raising an ineffective assistance claim.

23. *Herring v. New York*, 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975)(no aspect of our adversary criminal justice system could be more important than the opportunity of each side to marshal the evidence in closing

**STRUBHAR, J., CONCURS IN RESULTS:**

¶ 1 Based on the doctrine of stare decisis, I concur in the results reached by the Court in this case. I continue to believe that First Degree Murder By Child Abuse is and should be a specific intent crime as I expressed in *Fairchild v. State*, 1998 OK CR 47, 965 P.2d 391, 403 (Lane, J. dissenting joined by Strubhar, V.P.J.), opinion withdrawn and rehearing granted, 1999 OK CR 30, 992 P.2d 349, followed by opinion on rehearing, 1999 OK CR 49, 998 P.2d 611 (Strubhar, P.J. dissenting). I further maintain that a culpability assessment, i.e. a finding of intentional harm, must be made at some point in the process for the death penalty to be constitutionally sound in capital child abuse murder cases even if the defendant is the actual killer. *See Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). However, I yield to the majority here and agree that Steven Lynn Abshier's death sentence is valid based on the culpability assessment performed by the Court regardless of whether he committed or permitted the child abuse that led to Ashley Nicole Abshier's death.

arguments before submission of the case to judgment).

24. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2001).